## THE STATE TAX-LAW CASES.

*Tax law of 1882—Constitutional principles—Participation of outsiders in legislation—Notice to non-resident land-owners—Res judicata.*

1. The constitutionality of the General Tax-law of 1882 was questioned in the circuit courts for the counties of Marquette and Wayne. In one it was sustained and in the other denied. Upon review the Supreme Court was equally divided in each case, so that neither judgment was disturbed.

2. Whether legislation is invalidated by the participation of outsiders in the discussions of the Legislature—Q.

3. Whether the lands of resident-owners can be sold for taxes upon merely constructive notice to them by publication—Q.

Whether the statutory affirmance of a judgment on the equal division of the Supreme Court fixes the rule of law for any case but that which is under review—Q.

[State of Michigan v. Iron Cliffs Company.]

Appeal from Marquette. (Grant, J.)   April 18.—Sept. 23.

Petition for tax-sale.   Defendant appeals.   Affirmed.

*W. P. Healy* for appellant.   Legislative power cannot be delegated: *People v. Collins* 3 Mich. 343; *Parker v. Com.* 6 Penn. St. 514; *Thorne v. Cramer* 15 Barb. 115; *Barto v. Himrod* 8 N. Y. 491; *Exp. Wall* 48 Cal. 315; trial of adverse titles to land cannot be had in equity: *Blackwood v. Van Vleet* 11 Mich. 252; *Tabor v. Cook* 15 Mich. 325; Sedg. Const. Law 489 n.

Attorney General *Jacob J. Van Riper* for the State: Personal notice to resident or non-resident owners of lands,

in tax proceedings, is not a constitutional privilege, but is regulated by the law-making power of the State: *Sears v. Cottrell* 5 Mich. 251; Cooley on Taxation 334; *New Orleans v. Cordeviolle* 10 La. Ann. 732; *New Orleans Draining Co. Case* 11 La. Ann. 338; *Cuttle v. Brockway* 32 Penn. St. 45; as to the powers of the Legislature in the levy and collection of taxes, see *Hagar v. Supervisors* 47 Cal. 222, 233; *People v. Mayor of Brooklyn* 4 Comst. 419; *Murray's Lessees v. Hoboken Land Co.* 18 How. 272; to pursue every delinquent liable to pay taxes through the forms of process and a jury trial would materially impede, if not wholly obstruct the collection of the revenue: *Cowles v. Brittain* 2 Hawks 204; the Legislature can provide for levying and collecting taxes without a common-law trial: *Weimer v. Bunbury* 30 Mich. 202; *Doe v. Deavors* 11 Geo. 79, 86; *Harris v. Wood* 6 T. B. Monroe 641; *Harper v. Com.* 23 Geo. 566; *State v. Allen* 2 McCord 55; *High v. Shoemaker* 22 Cal. 363; *Bank of Columbia v. Okely* 4 Wheat. 235; the Supreme Court cannot take jurisdiction of chancery appeals unless permitted by statute: *Maxfield v. Freeman* 39 Mich. 64; *Weed v. Lyon* Walk. Ch. 77; *Cady v. Knit Goods Mfg Co.* 48 Mich. 133; *Mich. Ins. Co. v. Whittemore* 12 Mich. 311.

COOLEY, C. J. Prior to the year 1881 the practical operation of the revenue laws of the State had for some years been growing more and more unsatisfactory to the State authorities. To explain this it will be necessary to give a brief outline of the tax system. Taxes were apportioned according to a valuation of property made by local assessors. Local levies were voted by local boards, and the general taxes to be raised for State purposes were added to these, and a warrant issued to a local officer for their collection. This officer, if he was unable to collect any tax levied upon real property, made a return of the fact, and the parcels returned were advertised and sold at a public sale, subject to one year's redemption. The sale was made to the bidder who would pay the tax for the smallest portion of the land, and if no redemption was made the purchaser received a deed from the State which purported to convey a fee-simple title, and did so in fact if the proceedings were all legal. This effect of the deed it was supposed would make owners careful that a sale should not become absolute, and the State would get its

revenues in due season. The State, therefore, when lands were returned to it for unpaid taxes, assumed that portion of them which belonged to the municipalities, and carried the burden until the time of the annual sale. If for any parcel of land no bid was then made, the land was struck off to the State, and the State took the risk of being able to sell it for the amount of the taxes afterwards.

The system in theory seemed a good one, but serious difficulties were encountered in its administration. One of the chief of these was that very many parcels of land remained unsold in the hands of the State, and the taxes accumulated against them until they greatly exceeded the value of the land. It was found also that tax titles in a great many cases did not stand legal tests; and in such cases the purchasers lost the land and also the money paid for it. Sometimes the defect that defeated the title would be traced to some early stage in the proceedings, and would be seen to have been of such a nature that it might easily have been obviated had attention been called to it in time. The Legislature had at first thought to increase the disposition to bid for tax lands by providing that the tax deed should of itself be proof of good title, leaving the party contesting it to show defects if he could do so. Afterwards it had gone farther and provided in substance, that mere irregularities in the proceedings should not defeat them. But where defects existed they were very apt to be fatal in their nature, and as the proceedings are or should be in writing, it was commonly easy to point them out. It therefore came to be very generally understood that tax titles were worthless; and land-owners sometimes deliberately allowed their taxes to remain unpaid, on a calculation that it was cheaper to litigate and defeat them than it was to pay them.

The uncertainty attending tax titles did not, however, discourage people from dealing in them. On the contrary it is well known that certain persons made it their business to attend and bid at tax sales, and that they made enormous profits out of them. The number was small in any particular county,—perhaps a single bidder or two only,—

but they had their own way at the sales, and took the whole of as many parcels as they saw fit to select. It was a matter of course that there would be no competition in bidding so long as no reliance was placed on the titles Therefore if by any chance a poor man's tax remained unpaid and the land went to a sale, the whole was sure to be sold, though perhaps a tenth part of it would have paid the tax if taken at a fair valuation. Much less than a tenth part ought to pay it in many cases. The speculator who bought it calculated upon the inability or unwillingness of the owner to incur the expense and risks of a contest with all presumptions of law against him, and he expected to succeed in extorting a compromise on his own terms. And the less able was the owner to protect himself, by reason of poverty, or immaturity or other disability, the more certain was the speculator to make him the victim of extortionate demands.

At the commencement of the legislative session of 1881 the Governor called the attention of the Legislature to some of the difficulties which have been mentioned, and informed that body that the State then held nominal title to tax lands to the amount of more than $3,000,000, upon which taxes were constantly accumulating and remaining unpaid. That portion of these taxes which were local levies, constituting the major part of the whole, the State was required under existing laws to pay over to the localities, and thus the effect was that the State was regularly levying and collecting taxes from its people to make good to the municipalities the taxes which they failed to collect. The Governor made some suggestions by way of partial remedy for this anomalous condition of things. Having done this, he proceeded to say that, to revise the tax laws and bring all of their provisions in harmony, and make them easy of execution, more time would be required and more labor necessary than could be given or bestowed during the ordinary session of the Legislature, even though some of the members should abstain from other business for the purpose; and he therefore recommended "that provision be

made for the appointment of a commission, large enough to cover a diversity of talent and experience, into whose hands the work of revision shall be committed." This commission he thought should not be required to report before the next session, giving ample time for examination and for the deliberation and discussion essential for perfect work.

The Legislature concurred in this recommendation of the Governor, and an Act was passed which authorized the Governor, by and with the advice and consent of the senate, to appoint a commission consisting of five proper and discreet persons, whose duty it should be to prepare a suitable bill for the assessment, levy and collection of taxes, and to report the same to the Governor on the completion thereof. The commissioners were required forthwith, after their appointment, to meet at the capital, and to proceed with all reasonable dispatch to prepare and complete the bill, and upon the same being reported to the Governor, he was required to give it general publication throughout the State, and to report the same to the Legislature if in session, and if not, then at the next general or special session.

The Act further provided that after the submission of the bill to the Legislature the members of the commission should be entitled to seats upon the floor of the senate and house of representatives for the purpose of explaining the provisions of the said bill, and for that purpose it should be the duty of the said commission to remain in attendance during the session of the Legislature until the bill was disposed of, and that no amendment should be made to said bill in either house until after the same should have been proposed and submitted to the commission for at least twenty-four hours, or until they should have an opportunity to report to the house in which the amendment had originated, their views in relation thereto. Pub. Acts 1881, p. 146.

In compliance with this Act the Governor proceeded to appoint a commission, three of whose members were prominent and able lawyers, a fourth had had large experience in business, and also in important official positions in the State government, and the fifth was an extensive and well-known

farmer. It will probably be conceded that the choice of commissioners was admirable, and ought to have resulted in the preparation of an acceptable and safe tax system.

The commissioners immediately proceeded in the discharge of their duties, and prepared a bill which was given general publication through the State by the Governor, as the act providing for the Commission had required, and abundant opportunity was thus given for criticism and the pointing out of errors and defects. The Governor then convened the Legislature in special session to consider the bill, and the members had the advantage of being able to consider it at their leisure without having their attention drawn away by the pressure for legislation which commonly attends the regular session. When the bill was before the Legislature the members of the Commission had seats in the two houses, as was contemplated by the Act under which they were appointed, and all proposed changes in the bill were referred to them by the houses respectively, and by them referred back with their views. The members of the Commission were also permitted to be heard in open sessions. The Legislature contained at the time considerable legal ability, and it would hardly be supposed that any fatal defect in the system could escape notice or fail to be pointed out. Especially any conflict between the proposed law and the Constitution it would seem must certainly be discovered, either by the lawyers of the Commission or those in the Legislature, if not by other members. The result of legislative deliberations was the passage of the bill proposed, with slight alterations. As passed, it is entitled, "An act to provide for the assessment of property, and the levy and collection of taxes thereon," and it appears in Laws 1882, p. 7, and 1 How. Stat., p. 1265.

A brief abstract of the provisions of the Act will be necessary. The first eleven sections provide what persons and property shall be liable to assessment for taxation. Sections 12 to 26 inclusive provide for the assessment and the review thereof, and they make no considerable change in the old system except as they provide for a more careful review with a view to the prevention of inequalities and the correction

of errors, first by a township board, and afterwards by the board of supervisors. Sections 27 to 43 relate to the tax-roll, and the proceedings of the officer in making collections thereon; and sections 44 to 51 inclusive provide for the return to the Auditor General of the lands on which the taxes have not been collected, and for subsequent payment at his office. In all these sections the general features of the former law with which the people were familiar, have been preserved. The fifty-second section provides that any lands upon which the taxes shall remain unpaid for more than one year from the first day of July next, after their return to the Auditor General as delinquent therefor, shall be subject to sale in the manner by the act pointed out.

The proceedings which are to lead up to a sale are then given, and they are the following: After the first day of July, the Auditor General is to prepare and file in the office of the county clerk a petition addressed to the circuit court for said county in chancery, giving therein a description of all lands in the county upon which the taxes have remained unpaid for more than a year from the first day of July after their return, and the total amount of the taxes with interest extended separately against each parcel of land, adding sixty cents for expenses. The petition shall be signed by the Auditor General, and shall pray a decree against the land for the payment of the several amounts specified therein, and in default thereof that the lands be sold. The Auditor General is to cause a copy of the petition to be published at least once in each week for three successive weeks prior to the time fixed for the hearing thereof, in some newspaper of the county to be selected by him, and shall publish therewith for a like time a notice stating the filing and purpose of the petition, and that it will be brought on for hearing and decree at the next term of the court, and that all persons interested in the lands, and desiring to contest the lien claimed thereon for such taxes or any portion thereof, shall appear in said court and file with the clerk their objections thereto on or before said day, and that in default thereof a decree will be taken as prayed in said petition. In such notice he shall also state

that on the first Monday in May thereafter the lands described in the petition, and for which an order of sale shall be made, will be sold for the taxes, interest and charges thereon, as determined by the decree, at some convenient place in the county to be named in the notice. It is provided also that the publication of the notice shall be equivalent to personal service of notice on all persons interested, and should give the court jurisdiction to hear the petition, determine all questions arising thereon, and decree a sale of the lands. The Act then provides at length for the making of objections to any tax, and for a hearing of the same, and declares that in passing upon questions of the admissibility of evidence, the decision of the court shall be final. In case decree is given in favor of the validity of any disputed tax, the contesting party may appeal to the Supreme Court within twenty days, but must pay the amount of the decree to the county treasurer, to be held by him to abide the result in the appellate court. An appeal is also given to the State when a tax is held invalid. Such sales as are decreed, the county treasurer shall proceed to make on the first Monday of May, at the county seat. Each parcel described in the decree is to be separately exposed to sale, and the sale is to be made to the person offering to pay the amount charged against it and accept a conveyance of the smallest undivided fee-simple interest therein. No greater interest in any parcel is to be sold than is sufficient to pay the amount charged thereto; but if no person will offer to pay the amount and take a conveyance of less than the entire thereof, then the whole parcel is to be sold. A parcel for which no bid is made is to be offered a second time on a subsequent day, and if none is then obtained, the county treasurer is to bid off the parcel in the name of the State, for the use of the State, county and town, in proportion to taxes, interest and charges due each. The sales are to be reported to the court within twenty days after the time named in the notice for the commencement thereof, and all sales are to stand confirmed unless objections thereto are filed within eight days after the time limited for filing the report. The practice with reference to setting aside sales

is to be the same so far as applicable as in a sale in equity on foreclosure of mortgages. But no sale is to be set aside for inadequacy of price, unless on payment of the amount bid upon the sale, with interest and costs, nor be set aside after confirmation except in cases where the taxes were paid or the property was exempt from taxation, in which cases the owner may move the court at any time within one year after he shall have notice of the sale to set it aside, and the court may do so on such terms as may be just. If a sale is set aside, the county treasurer is to refund to the purchaser the amount of his bid with interest. But no sale is to be set aside after the purchaser, his heirs or assigns, shall have been in actual possession of the lands for five years. The county treasurer is to report the sales confirmed to the Auditor General, who is to execute deeds to carry them into effect. The deeds are to convey an absolute title to the land sold, and be conclusive evidence of title in fee in the grantee, subject, however, to taxes assessed and levied subsequent to those for which sale was made. The court on application may put the purchaser in possession by writ of assistance. The lands bid off in the name of the State are to be subject to sale thereafter by the Auditor General for the amount of the purchase price and interest thereon at one per cent. a month, and are to be offered at auction at the annual sales.

Such are the general features of the Tax Law of 1882, and it is easy to see on an inspection of these what views were paramount in the deliberations of the Commission. The most important change introduced by them into the tax system of the State was this: That instead of leaving all questions respecting the validity of the taxes or of the proceedings to enforce them to be passed upon in a suit to determine the title after sale made, as was the case before, it is proposed to have such questions determined in advance of the sale, that the land-owner may not be subjected to the risk of losing his land on a claim which in good faith he contests, and also that purchasers may know what they are to get in case of purchase, and be thereby encouraged to engage in a competition at the sales which will result in the sales being made—as they

were not before—at something like fair rates. If the law succeeds in accomplishing these purposes, the tax-payer will be benefited by it. And the State is likely to be greatly benefited by it, because under it fewer lands will be bid in by the State, and as to those which are thus bid in the State will account to the municipalities only as sales are made and it has money to account for.

Some further provisions of the law will be particularly noticed as occasion shall arise in the course of the discussion.

The Auditor General proceeded under the provisions of the Act, in respect to the delinquent tax lands of Marquette county, and on January 24, 1884, filed a petition in the office of the county clerk of that county, praying for decree for the sale of such lands as by the statute is provided. He published the required notice that the petition would be brought on for hearing and decree in the circuit court for the county of Marquette, on the first Monday of March, 1884, and that the lands for which an order of sale should be made would be sold for the taxes, interest and charges, on the first Monday of May, 1884, at the county treasurer's room in the city of Marquette.

The respondent, the Iron Cliffs Company, as owner of a parcel of land charged with a tax of about three dollars, appeared at the time appointed for the hearing, and demurred generally to the petition, and also assigned specially as causes for demurrer that the Act was unconstitutional and void for the following reasons: (1) No provision is made in said Act for personal service on resident owners of lands; (2) it provides for advertising a sale of said lands before obtaining a decree; (3) it cuts off the common-law right of trial by jury, which existed in such cases when the Constitution of 1850 was adopted; (4) it makes the decision of the circuit judge as to the exclusion or admission of evidence final, thus cutting off the right to appeal, except as the circuit judge may choose to permit; (5) the members of the Tax Commission, appointed under Act 153, Laws of 1881, were permitted to sit and act as members of the Legislature in all things except the right to vote, and were recognized by both houses

as a standing committee while said first-mentioned act was pending, thus giving to said Tax Commission an influence in shaping legislation not contemplated by the Constitution, which rests the legislative power in the senate and house only.

The circuit court upon hearing overruled the demurrer, and the respondent, electing to stand upon its pleading, availed itself of the statutory privilege and appealed to this Court.

The questions before us on the appeal are the questions raised by this demurrer, and they involve the constitutional power of the Legislature to do what by this tax law it has assumed to do. If the demurrer is sustained the law will be defeated, and we shall have decided that the Legislature has assumed to exercise authority which does not belong to it. In cases heretofore presented for our examination we have indicated certain rules of propriety and caution which should be observed by us when thus invited to declare void the action of a co-ordinate department of the government, and to those rules we should be. inexcusable if we did not strictly adhere. One of these is, that we must enter upon an examination of a constitutional question like this, assuming that the Legislature has been guilty of no usurpation. We are to remember also that we have no supervisory power in respect to legislation ; that the law-making power is not responsible to the judiciary for the wisdom of its acts, and that however unwise or impolitic their acts may appear, they must stand as law unless the Legislature has plainly overstepped its constitutional authority, or lost jurisdiction in the attempt to exercise it, by failing to observe. some express constitutional direction. And the case must be clear : a mere doubt on our part of the validity of what the law-making department of the government has undertaken to enact, is no ground for annulling it. These are commonplaces in constitutional law: they have often been declared by us, and still more often by other courts. There is reason to believe, however, that the rules are more often laid down than observed. When a court declares an enactment invalid,

its judgment is in general conclusive : the Legislature cannot appeal against it, and the public is likely to accept what is adjudged as probably correct, and to acquiesce without questioning it. Under such circumstances it is to be feared that courts sometimes, without perhaps being conscious of the fact, proceed in the examination of questions concerning the constitutionality of legislation as if they were at liberty to consider the questions as questions of policy merely, and to dispose of them according to the view they should take of the wisdom of the legislation. There is ground for the belief that sometimes statutes have been annulled by courts on objections that purported to be grounded in the constitution, but which, if plainly stated, would resolve themselves into this : that the judges did not like the legislation. But every such case is mischievous in its tendency, for it shows that courts lay down proper rules for the government of their own conduct, and then fail to observe them. It is not less important that a court should keep carefully within its proper jurisdiction than that the Legislature should observe the limits set by the Constitution to its powers; for the spectacle of a court imputing usurpation to the Legislature when in the very act the court itself is chargeable with a like disregard of duty, is neither edifying nor wholesome. We ought therefore, when we assert that the Legislature has exceeded its powers, to be able to assign reasons for the assertion that are sound and substantial. And if there ever was a case in legislative history in which the observance of this rule of propriety would seem to be particularly obligatory beyond what it commonly is, this would seem to be that case ; for here if we annul the legislation, we not only in doing so set our judgment above that of the Legislature, which under the circumstances we must think acted with great deliberation,—and which, as has been said, contained much legal ability,—but also above the concurring judgment of the able men who composed the Commission. The commissioners probably gave more time and thought to the questions involved than it has been within our power to do,

and their judgments on legal questions we should probably agree are entitled to great respect.

With these preliminary remarks, which seem justified by the great peculiarity of the case, the points made on the demurrer will now be considered.

I. The first objection made to the statute is, that it makes no provision for personal service on resident owners of land. We think this objection without force; but in view of the necessary length of the opinion, we pass it without discussion for the reason that the respondent, by filing demurrer, has put itself in a position which precludes the raising it. The notice is for bringing the party into court, and has no other office; but one who voluntarily comes and files demurrer is in court as effectually as he could be upon any notice. The right to notice in his case is waived, and whether some other party might have insisted upon it is no concern of his. *Stone v. Welling* 14 Mich. 514; *Burson v. Huntington* 21 Mich. 415; *East Saginaw &c. R. R. Co. v. Benham* 28 Mich. 459. No one can be injured by want of any particular notice who has thus appeared : the very appearance is conclusive that he has had notice sufficient for the purpose, and has acted upon it. Courts never assume to declare a statute void on the objection of a party whose course of action has been such as to waive the objection. *Embury v. Conner* 3 N. Y. 511; *Detmold v. Drake* 46 N. Y. 318; *Mobile & O. R. R. Co. v. State* 29 Ala. 373. A more conclusive waiver than appears here would be impossible.

II. The second objection—that the Act provides for advertising a sale of the lands before a decree is obtained—was not argued by counsel, and we therefore treat it as abandoned.

III. The third objection is that the Act " cuts off the common-law right of trial by jury," which is said to have existed in " such cases " when the present State Constitution was formed, and therefore to be of right now.

This objection is not so specific as would be desirable. It assumes that there was a class of cases in which jury trial was matter of right, and that this case belongs to that class; but

it does not undertake to specify the class, or to point out how or why this case belongs to it. This case is a proceeding in equity instituted by the State to enforce against a parcel of land a lien which it claims for taxes; and it is a different proceeding altogether from any which was known to our jurisprudence in 1850. It is a new proceeding, and therefore if jury trial cannot be had in it, that method of trial is not *cut off*, but is simply *not given*. There is nothing in the Constitution which renders it necessary to provide for jury trial in new cases. The constitutional provision is, " the right of trial by jury shall *remain;*" by which we are to understand merely that it is retained for the cases in which it existed before. *Tabor v. Cook* 15 Mich. 322; *Com'rs v. Seabrook* 2 Strob. 560; *Mead v. Walker* 17 Wis. 189; *Sands v. Kimback* 27 N. Y. 147; *Guile v. Brown* 38 Conn. 237; *Opinions of Justices* 41 N. H. 550; *Byers v. Com.* 42 Penn. St. 89; *Com'rs v. Morrison* 22 Minn. 178; *Scudder v. Trenton &c. Falls Co.* 1 Sax. Ch. 694: s. c. 23 Am. Dec. 756.

As explained on the argument the exception appears to be substantially this: When the Constitution was adopted, if a party claimed land by tax title, he must sue at law, and in that suit the defendant was entitled to jury trial. The proceeding now before the Court takes the place of such a suit. Therefore jury trial is matter of right. It is such a case as the suit at law to recover under a tax title, because it brings in question the validity of the tax proceedings.

But this more particular statement of the objection fails to show that the case before the Court is at all analogous to any in which, at the time the Constitution of 1850 was adopted, a party might have a right to jury trial. There was never any right to jury trial merely because of the fact that the validity of tax proceedings was in question. If a party brought suit at law against any collector or other officer connected with tax proceedings, or any township, on a claim that his rights were invaded by unlawful action, he would be entitled to jury trial; but if he attempted to enjoin tax proceedings he would be compelled to content himself with submitting his controversy to a court sitting without a jury.

And what was true then is true now in both these classes of cases. In the regular course of tax proceedings no jury trial could then be claimed any more than it can now: they proceeded without the intervention of a jury until they resulted in a sale of lands,—if the tax on lands was not otherwise collectible,—and in the giving of a deed therefor which prima facie vested a title in the purchaser. When that deed had been given, if the purchaser sought to recover the land upon it and brought his suit in ejectment, the original owner was entitled to demand a jury. This is just as true now as it was then. If this proceeding shall ever reach the point when a sale shall be made and a deed given, and if the purchaser shall bring his suit to recover possession, the defendant will have an undoubted right to a jury trial. No provision of the statute undertakes to deprive him of it.

But this proceeding is as different, not merely in form but in substance, from a suit to recover upon a tax deed as can well be imagined. A suit to recover upon a tax deed is a suit by one claimant to land against an adverse claimant, and the question involved is, who has the right to the land? But in this proceeding there are no adverse claimants. The respondent is supposed to claim a parcel of land, and the State, instead of contesting the fact, admits it. What the State says is, that it has a lien upon the land, which the respondent, as owner of the land, should satisfy; and it proposes, unless the respondent can show some good reason to the contrary, to proceed to a sale of the land unless the lien is discharged. Now we repeat, though it seems scarcely necessary, that in tax proceedings, from the time they were begun until they resulted in the giving of a deed, the land-owner, unless he instituted some suit at law upon a claim that a legal right was invaded, was never entitled to lay his complaint of the proceedings before a jury; and in that respect he is now, under this act, just where he was when the Constitution of 1850 was adopted.

But it may be said and is said, that in the event of a sale taking place and of a deed being given in these proceedings, jury trial would be an idle ceremony, because the Act makes

the deed conclusive evidence of title in the purchaser. In response to this it may well be replied—and the experience of every practicing lawyer will confirm it—that jury trial in cases involving the validity of a tax deed was always an absurdity. No other cases can be named in which the right exists at all, where it is so much a matter of mere useless form, and where the jury is so entirely without either the opportunity or the right to apply their own judgments to the case. Such a trial almost always involves only questions of law, or questions determinable by records; or if questions of fact are involved, they commonly concern records, and are peculiarly inappropriate for the consideration of a jury. Such cases are therefore either tried by the court without a jury, or if a jury is called, the court by his charge determines what the verdict should be, and the jury merely bow their heads in assent. Jury trial, therefore, as a great constitutional privilege in such cases, if not calculated to provoke a smile as an absurdity, is certainly without any claims upon courts for the straining of a point for its protection. But it may be added that, under the system which this Act undertook to displace, the tax deed of itself gave title, and the claimant's case was made out on its mere production. It is true it might be assailed and the title defeated on showing errors in the nature of jurisdictional defects; but jurisdictional defects are equally fatal under this Act. The judicial investigation only narrows the range of the inquiry which may be gone into after the deed is given, and perhaps limits it to the jurisdiction of the court itself.

But we do not deem it our duty to consider in this case every question which the parties may see fit to make, even though the record neither raises it nor can raise it. We have waived objection to answering the question whether resident owners are entitled to personal notice, but have done so because it referred to a proceeding already gone through with. But we must decline to consider what would be the effect of proceedings not yet taken, and which are wholly contingent and uncertain. The attempt to bring under adjudication the question of the right of the Legislature to pro-

vide for putting a tax purchaser in possession by writ of assistance, or to make a tax deed conclusive evidence of title, are questions which at present, in this controversy, are merely abstract and speculative. No deed has yet been given. It may be that no deed ever will be given. If none is given, no party will ever be in position to move the court for a writ of assistance, or to claim that his evidence of title is conclusive. When the time comes that such a question can be raised, if it ever does come, it will be quite time to decide it. We said in *Upton v. Kennedy* 36 Mich. 215, 218, that "it is a sound rule of policy no less than of courtesy, that a court shall abstain from questioning the validity of legislation until it becomes absolutely necessary in the decision of a pending controversy. When the necessity arises the court must apply the law that controls the case, whether it be statute or Constitution; but a conflict between the statute and the Constitution is not to be inquired into until it is found to affect some interest involved in a suit or proceeding which the court is required to pass upon." The same doctrine was reiterated in *Powell v. Eldred* 39 Mich. 552. The question, therefore, of the effect of the deed cannot be raised now; any dictum by us concerning it would determine no right, and would for that reason be improper and extrajudicial.

To avoid any misunderstanding on this point it should be stated that the court itself, which passes upon the tax proceedings and which determines the question of confirming the sale, does not declare what shall be the effect of the deed. The court confirms the sale or refuses to confirm it. It is the statute which says, if the sale is confirmed and a deed is given it shall be conclusive evidence of title. The deed is not a part of the judicial proceeding, but the giving of it is the subsequent act of the administrative officer. If as matter of constitutional law, the Legislature cannot give this conclusive effect to the deed, the fact is immaterial to the judicial proceedings and can have no effect upon them. The court itself, if it were asked upon the hearing on confirmation to declare that the deed which might be given

thereafter should be conclusive evidence of title, would be powerless to comply. An opinion by the judge to that effect would be as absolutely without force as if expressed by the clerk or the crier of the court. The question of conclusiveness can only arise for judicial determination when a deed has been given and some party claiming under it attempts to enforce a right to possession.

What is said on this point is applicable to the case of an application to the court for a writ of assistance. The statute says the court may issue such a writ to put the purchaser into possession, and the respondent denies the power. Let it be admitted that no such power exists, and the proceeding now under consideration will nevertheless stand unaffected. No writ of assistance is now applied for, and we cannot say that it ever will be. The only question now is, whether a sale shall be ordered: nothing else is presented by this record.

When a purchaser attempts to recover the land purchased, if it shall turn out in the ejectment or other proceeding instituted by him that the legislative power to give this conclusive effect to the deed is not sustained, the judgment to that effect could have no retroactive force. It could affect neither the validity of the law itself, nor of the order of sale. On the contrary, the question of constitutional law which arises on the deed would go only to the validity and force of this particular provision. If the Legislature has not exceeded its powers in prescribing this judicial proceeding, the proceeding, if regularly taken, must stand. If it has exceeded its powers in making a deed, when given, conclusive, then the purchaser who has obtained a deed, may be disappointed in its value to him, but nevertheless he has it and must make the best of it. If it is not conclusive proof of good title in him, then the adverse claimant will be entitled to point out defects.

Declaring tax titles conclusive is no new thing in legislation. It is matter of familiar history in this State that the Legislature has repeatedly undertaken to give greater force to tax deeds than could legally be sanctioned. But the

attempt, though unsuccessful, was never supposed to affect
the whole tax law.    We do not deem it important to enlarge
this opinion by citing the numerous decisions which are to
be found in the books of reports on this subject; it seems
entirely sufficient to barely call attention to the familiar
principle that one bad section in a statute has no necessary
effect to invalidate the whole (*Com. v. Hitchings* 5 Gray
485; *Smith v. Adrian* 1 Mich. 495; *People v. Mahaney* 13
Mich. 481), and then to add, what we think no one will dis-
pute, that a case like this has always been held to be within
it.    The territorial statute of 1827 declared that the deed
given on a tax sale "shall vest in the person or persons to
whom it shall be given an absolute estate in fee-simple,"
and "shall be conclusive evidence that the sale was regular
according to the provisions of this act:" Rev. Laws 1827,
p. 378; 1833, p. 96; but the courts, while they construed
this section so as to deprive it of its plain meaning and to
defeat the legislative intent, yet raised no question of the
validity of the statute in other respects: *Scott v. Young
Men's Soc.* 1 Doug. (Mich.) 121; *Latimer v. Lovett* 2 Doug.
(Mich.) 204; and the statute continued to be acted under
and enforced until repealed by the Legislature many years
afterwards.    If the court, instead of construing away the
meaning of the Legislature, had contented itself with saying
this section so far as it undertook to make the deed conclu-
sive evidence was unconstitutional, the effect would have
been the same,—the statute would have remained, and
would have been enforced in all other particulars.    Possibly,
if the time ever comes when the court can with propriety
pass upon this provision for making the deed conclusive, it
will deem its duty to be to do in respect to this Act what
was done in respect to the Act of 1827, and to hold that,
under a proper construction, defects in the tax proceedings
may be shown.    But the time for ruling upon that question
can only arise when there are adverse parties entitled to
raise it, and when they actually do raise it, and are heard by
counsel upon it.    There are no such parties now.    The

question now is whether the State has a lien which the land should be sold to satisfy.

It is often said that a court of chancery is not the proper tribunal for the trial of titles to land; and perhaps a notion has arisen from this that there is some constitutional impediment. If it were the fact, it would be immaterial in this case, for this, as we have already said more than once, is not a case in which titles are to be tried, or in which a title is even disputed. But the notion that the chancery court cannot try titles to land under proper legislative authority is quite baseless. My brother Campbell showed this very satisfactorily in *Hoffman v. Beard* 22 Mich. 59, 69. That case was a suit in partition, and the land was held adversely to the complainant. The title was purely legal, and no impediment existed to the trial at law, and the court thought it ought to be so tried. This was not upon the ground of any want of power in the Legislature to confer jurisdiction upon the chancery court, or of the court to exercise the jurisdiction without special statutory authority, but only that it was more consistent with the general course of equity jurisprudence to have a question of legal title to land sent to a court of law for trial. But Mr. Justice Campbell was of opinion that the complainant had an absolute right under the statute to have the title determined in equity. He says: "An idea seems to have prevailed that controversies concerning legal titles can only properly be determined in common law actions, and that whenever such a dispute arises in a partition suit, and is a real and not pretended controversy, the proceedings should either be dismissed or stayed to abide the result of an action. It is not to be denied that there are some cases, and more dicta, which assert such a doctrine. But whatever may be their force under other systems and policies, they cannot, it seems to me, be of any force against the clear terms of the statute, and would not apply to our system even if the laws were less explicit." Page 69. " The courts of this State, when we had a separate chancellor, never required aid in deciding legal questions; and now that the same judges act in the double capacity, it

would be a gross absurdity to act on any such theory as rests on a supposed unfitness in equity judges to decide the law." Page 70. "If a case is not required to be tried by jury, it would be of no use to shift it from one court to another before the same judge. And if there are any questions of fact that it is desirable for a jury to pass upon, it is better to have them presented separately as chancery issues, than to have them thrown before the jury with all the mixed questions that may be presented by an ejectment suit. Land titles are usually established by evidence much more fit to be passed upon by a judge than by a jury. And since our Constitution favors the removal of all needless distinctions between law and equity, and our statutes have furnished ample means for disposing of every kind of question in courts of equity, I can see no good reason for resorting to a practice that was never meant to exist under such a system as ours." Pages 71, 72. There is more to the same effect. The majority of the Court differed with Mr. Justice Campbell about the propriety of having the title in that particular case tried in a suit at law, but there is not a word in the opinion of the majority from which it can be inferred that any member of the Court doubted the power of the Legislature to provide for the trial in equity of any legal question that might arise in partition or in any other equitable suit. And if there is anything in the Constitution which limits the power to cases of partition, we have not discovered it.

The objection that this Act in some way impairs the constitutional right of jury trial has been found very embarrassing in this case, from the fact of an inability to perceive what bearing much that has been said in favor of the objection can have or was supposed to have. It seems to us that very much of it may be passed without notice, as not being susceptible of any conclusion for or against the validity of this law. Suppose it to be true — as we suppose it undoubtedly is — that the king or queen in England can create no new court of equity or enlarge the equitable jurisdiction of no existing court; of what practical interest is the fact to us in this country? We have no king here, and the officer

whose functions make the office most analogous to that of the king has not assumed to create courts or to enlarge the jurisdiction of courts. That authority in this country is exercised by the Legislature; and if any argument is intended to be deduced from the British system against the power of an American legislature to create new chancery courts, or enlarge the jurisdiction of existing courts, it is Parliament, and not the king, whose power should be compared. But no one ventures to say that Parliament could not do what the Legislature of Michigan has assumed to do; and it may be said, we presume, without danger of contradiction, that its power to create and enlarge equitable jurisdictions is not only undoubted but unlimited. That it may do this in such a way as to take away the right of jury trial at law was sufficiently shown in *Bovill v. Hitchcock* L. R. 3 Ch. App. 417. Such being the case, the question what the king could now do or could ever have done in the same direction, may possibly be one of curious historical interest, as may also be the question whether King Alfred, when hiding from his enemies, was berated by the neat-herd's wife for neglecting to watch her baking cakes; but the one question has no more practical value at this time and in this country than the other.

As it is the "common-law right of trial by jury" which it is said has not been preserved in this case, it may be necessary to remark that the Constitution in its guaranty of the right does not make use of the term "common law;" it merely says, "The right of trial by jury shall remain." Undoubtedly this means that the right shall continue to exist with its accustomed common-law incidents; but that it shall remain as a peculiar attribute of a common-law court is an inference which is quite unfounded. Indeed, nothing is more plain, when the Constitution is read in the light of contemporary history and opinion, than that it was not intended there should be distinct common-law and equity courts after the Constitution took effect. The Constitution in terms vested the judicial power "in one supreme court, in circuit courts, in probate courts, and in justices of the peace." Article 6,

§ 1.   It was intended that the circuit court—not two courts but one court—should be the court of original jurisdiction in civil cases of both law and equity cognizance, and that in that one court the distinctions between law and equity proceedings should, as far as possible, be abolished.   Article 6, § 5.   Notwithstanding this constitutional intent the distinctions have been kept up, and the circuit court has been spoken of and regarded, not as one court but as two—a court of law and a court of equity.   To this extent there has been an evasion of the Constitution; but to go further and say that the jury trial which the Constitution preserves is a trial that must take place in a court of common law, as distinguished from a court of equity, would not be a mere evasion of the Constitution, but would be in direct and positive antagonism to the provisions which were designed to bring about the abolition of the distinctions in law and equity proceedings. If the Legislature were to provide that hereafter the complaint of a party instituting a suit, whether before of equitable or of legal cognizance, should be in the form of a bill in chancery, briefly reciting the facts on which relief is claimed, and that any issue of fact made upon such a bill should be triable by jury, the law for that purpose, instead of being opposed to the Constitution, either in its merging the two jurisdictions or in its providing for the trial in chancery of cases before triable at law, would be entirely in harmony with the spirit and purpose of the Constitution, and would stand justified and supported by the very words of that instrument.

We have given more attention to this part of the case than it seems to us entitled to, for the reason that in the minds of some persons there seems to be a peculiar sacredness about jury trial, and an inclination to battle for it as a constitutional privilege in cases in which it never existed at all. Perhaps this is due in part to the fact that one branch of the controversy which resulted in the independence of the American colonies was connected with a violation of this right.   That fact has been referred to in this case; and it has been mentioned that the right was violated in revenue cases,

as if the right existed more particularly in those cases than in others. But the fact is that no case at all analogous to the one now before us arose at that period at all, and there is no warrant in the history of the times for saying or inferring that a statute like the one now under consideration would have been objected to as invading constitutional rights. The colonists were contending for rights that had substance and value in them, and they very justly denied the right of the government to issue general warrants in revenue cases, or to send alleged offenders against the revenue laws out of the colony for trial. But it would require a very vivid imagination to picture to the mind the leaders in the American revolution endeavoring to rouse a continent to arms, because a statute had undertaken to empower a court to examine into tax proceedings and pass upon their regularity before property should be sold for the taxes.

The case of *Tabor v. Cook* 15 Mich. 322 has been referred to by counsel as having a bearing here. That case is one in which a party undertook to bring ejectment in the form of an equity bill. We held that the statute did not undertake to permit such a suit. We also said that, as in ejectment, the party in possession had a constitutional right to have his case tried by jury, the statute could not transfer the jurisdiction to equity unless it should make provision under which jury trial could there be demanded and had as matter of right. We adhere to that view still.

IV. The fourth objection is that the Act makes the decision of the circuit judge final on questions of the admissibility of evidence, "thus cutting off the right to appeal except as the circuit judge may choose to permit."

This point was not noticed on the argument, and the natural and reasonable inference would be that counsel, on consideration, had become satisfied it was without force. In our discussion of the case we should therefore follow the example of counsel, and pass it without remark, if in our own consultations importance had not been attached to it. Lest, therefore, we might be thought, by not noticing it, to concede that it possessed some force, we take it up in its order.

As the questions in the case are merely questions of the constitutional power of the Legislature to pass the act in question, this objection must be understood to be based upon a claim that a party has a constitutional right to an appeal, and also to have the appeal cover the whole case, including rulings of the trial judge on the admissibility of evidence. If this is not claimed the objection is pointless. We shall therefore assume that to be the claim.

But if that is the claim, upon what is it founded? What general principle of constitutional law, or what provision of the State Constitution, directly or by reasonable implication gives such a right of appeal? If the right exists, it must have a basis that can be defined, pointed out, and made tangible to the common understanding: it cannot exist as a mere vague and loose notion, which a judge may embrace and act upon if it suits his ideas of what ought to be, and reject if it does not. Constitutional rules, above all others, are supposed to have certainty and definiteness, and not to depend upon the opinions of judges upon questions of policy and expediency.

No general principle of constitutional law giving a right of appeal has been mentioned, and we know of none. We therefore assume that there is none. Perhaps it may be thought by some persons that the right of appeal should be universal, but this would probably be doubted by as many others. Every one is entitled of right to have a judicial determination of his controversies, but no general principle entitles him to remove the determination from one court to another until the court of final resort is reached. The power of final decision must rest somewhere, and in a great many cases, it perhaps subserves the purposes of justice quite as well if the first tribunal is given final powers. But it would, as we suppose, have final powers unless expressly or by necessary implication an appeal was given by statute or Constitution.

If any provision of the Constitution gives a general right of appeal from the inferior courts to the Supreme Court, it must be that which declares that "the Supreme Court shall

have a general superintending control over all inferior courts, and shall have the power to issue writs of error, habeas corpus, mandamus, quo warranto, procedendo and other original and remedial writs, and to hear and determine the same. In all other cases it shall have appellate jurisdiction only." Article 6, § 3.

Here it will be perceived a general power of superintendency is given, with authority to issue certain original writs, and then it is added that except as to such writs the jurisdiction of the Court shall only be appellate. What appellate jurisdiction it shall have, whether a jurisdiction extending to all cases, or only one extending to some cases to be otherwise pointed out and specified, is not by this provision declared. If it is not an unlimited jurisdiction, it must necessarily in some manner be defined.

We shall probably hazard nothing in saying that, up to. the time of the hearing in this case, the jurisdiction of this Court to take cognizance of cases on appeal has always been understood by the Court itself to depend upon express statute, and that a party could not claim the right to appeal unless some statute gave it. In other words the understanding has been that while the Constitution gave appellate jurisdiction to the Court, a statute was necessary to make the jurisdiction applicable to any particular class of cases. It has also been just as well understood that the statute which gave the appeal might limit the power of this Court to consider questions upon it.

This general statement is made with great positiveness, because the Court constantly acts upon this understanding. There is a very large class of questions which are decided finally and conclusively by the circuit courts. We cannot review their decisions because there is no statute providing for it, and they are therefore conclusive, though we may be able to see in particular cases that great injustice has been done. The case of an application for a new trial in the circuit court is one of these. *Cuddy v. Major* 12 Mich. 368; *Penn. Mining Co. v. Brady* 14 Mich. 260; *Johr v. People* 26 Mich. 427. A statute might unquestionably make the

decision on such an application reviewable; but we have no such statute.

But this point is not one resting upon a course of practice merely; it has been directly affirmed on argument more than once. In *Weed v. Lyon* Walk. Ch. 77, where a complainant against whom decree had been entered had failed to file his appeal bond within the time limited by statute, Chancellor Manning said: "The right of appeal from this court to the Supreme Court is a statutory right, given to either party who may be dissatisfied with the decision, on certain conditions, which can no more be dispensed with by a court of equity than by a court of law where the right has been lost by an omission to comply with the statute. It is the complainant's misfortune that the appeal bond was not filed within the ninety days; but it is not in the power of the court, under the circumstances of the case, to give relief." In *Drake v. Andrews* 2 Mich. 203, the appellant was one day late in taking his appeal. He claimed an additional day because the last day happened to be Sunday, but the court did not allow the claim. Wing, J. said: "The statute is plain. It is rather a rule of convenience, but we think we have not the power to extend the statute." "We must stop where the statute stops, and therefore we are reluctantly constrained to grant the motion of the appellee, and dismiss the appeal with costs." It was a hard case, and the court would have sustained the appeal if it had possessed the power. In *Appeal of Dickinson* 2 Mich. 337, a similar decision was made in a probate case; in *Canfield v. Brig City of Erie* 21 Mich. 160, in a water-craft case; and in *Draper v. Tooker* 16 Mich. 74, Justice Christiancy, speaking for the Court, says that the circuit court has "no power" to allow an appeal from a justice except on the statutory conditions.

Numerous cases to the same effect might be cited, but it seems needless, as Justice Campbell, in the recent case of *Cady v. Knit Goods Mnfg. Co.* 48 Mich. 133, 137, expressing the unanimous opinion of the Court, said: "No appeal lies in any case except where given by statute." This, we think, should be conclusive.

We might show by reference to statutes, if it were important, that the Legislature has repeatedly enlarged and also restricted the jurisdiction of this Court, and the Court has unhesitatingly obeyed the legislative will, regardless of any opinion it might have had of the wisdom of the legislative action, and solely because it was supposed that the legislative will, expressed in proper form, was *law*, and conclusive upon the Court. The case of the statute which took from this Court the power to review judgments of courts of law upon the facts (Laws 1867, p. 198), is an illustration of a statute which restricted our jurisdiction. The effect was that the appeal which was general before, became partial afterwards ; that is, it became restricted to a particular class of questions. *Heimbach v. Weinberg* 18 Mich. 48. A recent act giving a new jurisdiction is found in Pub. Acts 1873, p. 119. *Willard v. Magoon* 30 Mich. 273.

It is not necessary for us to inquire into the reasons of the Legislature for making the decision of the circuit judge on questions of admissibility of evidence final, but it is easy to see that if such questions might be reviewed on appeal, the ability of the State to collect its revenues promptly would be more than doubtful. We should then have in tax cases, as we often have in other cases, trials in the circuit court not conducted by the parties with a view to just results, but with a purpose to get error into the case if possible, that there may be delay and a reversal. And there is no doubt that the trial judge has some advantages over the appeal court in passing upon such question. Of two judges with equal ability and legal knowledge, one of whom tries the cause and the other reviews the trial, the first, who sees it all pass in successive steps before him, is most likely to see the just bearing of everything offered in evidence, and therefore most capable of deciding what should and what should not be received in evidence. The Legislature was probably influenced to some extent by a knowledge of this fact.

V. The remaining objection made by counsel is that the members of the Tax Commission, by being allowed to sit, act and speak in the two houses while their bill was under

consideration, was given an influence in shaping legislation not contemplated by the Constitution, which vests the legislative power in the senate and house only. This is very strenuously insisted upon.

Two general reasons are advanced in support of the objection : *First*, that the Legislature in providing for the presence and participation of the commissioners while their work was being considered, delegated to them some portion of the legislative power, which constitutional principles do not permit; and *second*, that the presence and participation of the commissioners in the business of the session was of itself unlawful and rendered the action which was taken invalid.

The first reason would have force if it were based in fact, but it is not. The Legislature did not part with any portion of its power, but retained it undiminished throughout. It was never proposed to surrender to the Commission any legislative authority, but on the contrary, the act under which the tax bill was prepared plainly assumed, if it did not in terms say, that all powers of final action were to be exercised by the Legislature itself. And they were so exercised. It was indeed provided that the members of the Commission should have seats in the two houses, and that all proposed changes in the bill prepared by them should be referred to them for their consideration, with the privilege of expressing their views. But the Legislature in making this provision did not detract in the least from its own powers, or tie up for a moment its hands. It might at any moment have taken from the commissioners the privileges which had been given, or it might have refused to permit them to be exercised. The privileges existed from hour to hour only at the legislative will. This being so, it is plain that the Legislature had parted with no powers. A case of delegation of power exists when the Legislature, instead of deciding for itself whether a proposed law shall be enacted, refers it for decision to some other authority ; as, for example, to a popular vote. *Barto v. Himrod* 8 N. Y. 483. There are a num-

ber of cases holding that the delegation of the power of final action is void, but none which go any further.

It must therefore be the participation of the commissioners in the legislative deliberations in this case that creates the difficulty, if there is one, and not the fact that a privilege of participation was promised by the act under which the commissioners were appointed. Whether there was any constitutional objection to such participation is then the question to be considered.

It is very easy to understand the grounds on which the Legislature deemed it advisable that the commissioners should be present and be heard when their work was being considered. It was supposed the Governor would select persons for the Commission who, in respect to the duties to be performed, would be men of more than ordinary competency—men who might be considered experts in tax matters. It was also supposed that these experts would devote a large amount of time to the duty of preparing a bill, and that the bill when prepared would be harmonious in all its parts. The subject is so broad that the bill would necessarily be somewhat complicated, but every section would have its bearing upon other sections; every new feature proposed to be introduced in the tax system would have its reasons; every modification of the old law would be made on a consideration of its actual workings. The commissioners would have considered all these matters; but it would be too much to expect that this would be the case with every member of the Legislature, or even with any considerable proportion of the members. It might very well happen, therefore, that the Legislature, coming newly to the examination of a bill prepared by others, would unintentionally impair its provisions and render the bill as a whole worthless by amendments, the full effect of which they did not perceive, or by striking out vital provisions, the reasons for which were not made known to them, or by doing something else with the bill unadvisedly which an expert familiar with its provisions would readily have guarded against. The Legislature, in view of these facts, provided for the presence of the commissioners in order

that, as far as possible, the final action should be taken with full knowledge and on proper deliberation.

This seems a very proper thing to do; just such a thing as a legislature ought to do, when practicable, in dealing with so complicated and difficult a subject. If legislatures were more often equally careful to be fully advised by experts before legislating upon intricate and difficult subjects, we should be saved some crude and mischievous legislation. If, for example, the regulation of a particular business was proposed, the Legislature would be wise and deserving of commendation if it should avail itself of the experience and observation of persons engaged in that business in the various capacities of proprietor, agents and laborers of all grades, and allow them to inspect and criticise any proposed bill. And if the effect of the criticism were to induce the Legislature to modify any proposed action, it would be highly probable that the modification had foundation in wisdom and was therefore commendable.

Not only is such a course apparently proper because of its wisdom, but it is not uncommon. It is almost a matter of course at Washington and at some state capitals, to call experts before legislative committees, or to permit them to appear there when information is needed of which they are peculiarly possessed. The right to do this has never been disputed so far as we know. It is not so common to have such persons appear and express their views to the full house; but that also is sometimes done, and would seem, when practicable, to be the more desirable course, because then all the members can receive information from them directly, instead of obtaining it indirectly and perhaps imperfectly or inaccurately as reported by others.

If this is objectionable on constitutional grounds because the result is that the views of others modify the legislative action, then it must be inadmissible for the same reason to have a commission prepare a bill for the Legislature to act upon. The very preparation of the bill would be likely to result in the whole or some portion of it being adopted and passed; and then it might be said that the Legislature had

been influenced from an unconstitutional source in its action. The same might be said with quite as much reason, if one privately were to urge his views on a pending measure upon a member of the Legislature; and in fact such a private approach of members is much more objectionable than any public discussion in open house can be. And if the objection which is now made were pushed to its natural and logical result, legislators would be compelled to frame and enact laws without the privilege of enlightening their judgments by the knowledge, the experience, the observation and the good sense of others. Legislation under such circumstances would generally be evolved from the inner consciousness, and might do very well for a Utopia, but would be almost certain to be crude and impractical and therefore unwise for an American commonwealth.

A number of cases have been cited to us where it has been held that where a duty is devolved by law upon a certain body of men, and they admit any other person to a share in their deliberations, their action is rendered null thereby. Those cases are correct and have our full approval, but they are all cases where the body has judicial functions to perform. The difference between a judicial body and a legislative body in this particular is so marked as to make directly opposite rules applicable in the two cases. And it is a difference that rests upon such manifest reasons that no one need be misled in respect to it. A judicial body is to act upon fact and law as they are submitted to it regularly and publicly, and with the parties present; and it is to decide upon what is thus submitted. It is inconsistent with judicial methods that judge or jury should investigate facts independently, or be even talked with respecting facts not regularly submitted. If jurors, while a case was pending before them, were to make investigations of their own, and make the case a subject of conversation with third parties, they might be and ought to be punished as for a contempt of court for so doing. But legislators are confined to no one method and no particular time in obtaining the information they are to act upon. They get it where they can, and when and of whom they

please. The more they endeavor to learn that which others can inform them of, the better legislators are they likely to be.

The Constitution of the State recognizes this difference in the provision that " the people have the right peaceably to assemble together to consult for the common good, to instruct their representatives, and to petition the Legislature for redress of grievances." Article 18, § 10. This section gives and was intended to give to the people the right to present their views to the Legislature on any subject which is of legislative cognizance. The members of this Commission had an undoubted right, from day to day and from hour to hour, to put their views on proposed changes in their bill before the Legislature in the form of petitions; and that body could not have refused to receive the petitions. And it seems to us quite idle to say that where the Legislature is compelled to receive the views of a party presented in writing, it has no power to permit him to appear in person and express the views orally.

But the right of petition does not exist in respect to judicial action, and an attempt to exercise it would in general at least be a criminal contempt. We have only to suppose a case of parties petitioning a court to render a judgment in favor of a particular party, or sending to a jury a request that they would acquit or convict a prisoner who was on trial before them, and it would be apparent at once that the attempted act of petition, which towards a legislative body is matter of constitutional right, is towards a judicial body a serious offense against law and justice. And the difference in the two cases in the application of principle springs from this very difference in the methods of acquiring the information which is to be acted upon; the judge and juror being restricted to definite time and definite methods, and the legislator being left wholly at large to enlighten his mind and his judgment as he may, and being in fact compelled to listen to those whose right it is to "instruct" and "petition" him. The fifth objection, then, like the others, has no substantial basis.

VI. The criticism of the statute has not, however, been restricted to the objections specially assigned with the demurrer, but has gone into a minute examination of the various sections, with a view apparently to show that some of the provisions are crude and imperfect, . some are liable to operate unjustly, and some in possible contingencies will not operate at all. From all this criticism an argument is made against the validity of the Act, but upon what principle this Court is expected to set aside a statute for such reasons, we have been unable to understand. The criticism referred to raises questions of policy, accuracy in legislation and justice, and might have force if addressed to the Legislature, whose business it is to solve questions of the sort when considering how and in what form their will shall be expressed as law. But when made to us, accompanied with an appeal that we shall annul existing legislation, it is made to induce us, if possible, to usurp powers which do not belong to us; to sit without right as an appellate authority above a co-ordinate department of the government in respect to matters which belong to that department exclusively. Nothing is better settled in constitutional law than that questions of policy and justice in legislation are for the Legislature itself, and that courts have no authority to set their judgment against that of the Legislature in respect to such matters. The courts have no business to run a race of opinions upon points of right, reason and expediency with the law-making power. *Madison &c. R. R. Co. v. Whiteneck* 8 Ind. 217; *Pennsylvania R. R. Co. v. Riblet* 66 Penn. St. 164, 169; *Martin v. Dix*, 52 Miss. 52, 64; *Danville v. Pace* 25 Grat. 1, 8; *Re Goodhue* 19 Ch. (Ont.) 366; *Reithmiller v. People* 44 Mich. 280. We might with entire propriety, therefore, decline to consider all objections of this nature, as raising no questions with which we have a right to concern ourselves; but as notice has been taken of them in this case, we may be pardoned for giving them some attention also. We shall do so, however, to a limited extent, and mainly for the purpose of showing that most of the objections now made to this Act might have been made with the same force to any statute on

the subject which has been in existence in this State for a long time past, and that if this Act is invalid on these grounds, the courts for a generation past have been enforcing invalid tax laws.

For example, counsel for respondent in his brief says that "if a person by inadvertence does not pay his tax, he is likely to lose his land if the law is valid." This is very true, and has always been true under any tax law which ever existed in this State, and is probably true under tax laws in every state of the American Union. Legislatures have considered it a necessity to the collection of state revenues that property owners should at their peril be required to take notice of tax proceedings and pay their taxes. And it is a new suggestion altogether that the inadvertent omission of the land-owner to pay his taxes can be reason either for the State to lose its revenue or for a court to hold the tax law invalid.

It is complained of as something opposed to all the maxims of jurisprudence, that in the proceeding for obtaining an order of sale the taxes specified in the petition are to be presumed legal, and a decree to be made therefor unless the contrary is proved. But there is nothing new or strange in this, either in this State or elsewhere. For forty years before the institution of this proceeding the statutes of this State had made the tax deed "prima facie evidence of the regularity of all the proceedings to the date of the deed" (Sess. L. 1843, p. 80), thereby making the mere giving of the deed by the Auditor General proof that a tax was correctly levied as stated therein; and the courts in a series of decisions beginning with *Lacy v. Davis* 4 Mich. 140, and including such cases as *Upton v. Kennedy* 36 Mich. 215; *Stockle v. Silsbee* 41 Mich. 615; *Silsbee v. Stockle* 44 Mich 561; *Perkins v. Nugent* 45 Mich. 156; and *Sinclair v. Learned* 51 Mich. 335, have enforced these statutes. The first statute on the subject which was enacted after the Constitution of 1850 took effect, provided that in suits for the collection of unpaid taxes the assessment roll might be produced in proof of the taxes, "and if it shall appear from said assessment roll that

there is a tax therein assessed against the defendant in such suit, it shall be prima facie evidence of the legality and regularity of the assessment of the same; and the court before whom the same may be pending shall proceed to render judgment against the defendant, unless he shall make it appear that he has paid such tax." Comp. Laws, 1857, § 830. This provision, or something like it, has been in existence in this State ever since, and recoveries for taxes have been had under it in a great many cases without any such point being made or thought of as is now insisted on. The recent cases of *Wattles v. Lapeer* 40 Mich. 624; *Putnam v. FifeLake* 45 Mich. 125; *Lake Shore &c. R. R. Co. v. People* 46 Mich. 193; and *First Nat. Bank v. St. Joseph* 46 Mich. 526, are cases of such suits which came to this Court on other questions without this being raised. But indeed the rule that the tax roll shall be sufficient affirmative evidence of the tax is the only reasonable and practicable rule that can possibly be prescribed for the case. It is perfectly reasonable, because the tax-roll is in itself a species of execution, and the collector has a right, which nobody disputes, to proceed to enforce payment of the taxes by seizure of property; which could never be admitted unless the taxes were already established claims. And any other rule would be impracticable because it would make the collection of taxes enormously troublesome and expensive. Suppose the property owner, where the collector demanded payment of the tax, was at liberty to reply: "I will pay the taxes when you prove they have all been voted, assessed and levied in accordance with law." The absurdity of any rule of law which would permit this, and which would require the collector to produce his proofs before he should levy, would be too apparent to require argument or illustration. But it would be quite as reasonable as to require similar proof when the State brings suit. All that is wanted in the one case or in the other is that the officer or the court should have sufficient prima facie evidence of the tax; and what proves it for the officer's action ought to prove it for the action of the court. Any other rule would in many cases make the cost of collection

greater than the amount of the tax, and the State would be in danger of being bankrupted in the attempt to collect a revenue.

But we think we may well be content to rest the defense of this feature of the law on the enforcement which similar provisions have had in the State for so many years without their constitutionality being questioned.

Section 78 of the Act empowers the Auditor General, in the highly improbable contingency that the county treasurer shall refuse or neglect to give bond for the performance of his duties in making sale of the lands, to "employ in behalf of the State, some other person to conduct the sales of lands delinquent for taxes, and to receive payment therefor under his direction," &c. This is criticised: it is said the Auditor has no power of appointment, and, moreover, that the statute is deficient in not making provision for proper return of the doings of any person so employed. This raises another question which is purely abstract and speculative in this case. There has been no such appointment; it is not known there ever will be. If there should be, and the sales for any particular county should fail for that reason, the validity of the law would not thereby be impaired, or the sales in other counties affected. If the fact that in some possible but highly improbable case a statute would fail to accomplish its purpose, though it did so generally, were to be fatal to the law itself, we should have very few valid enactments on our statute books.

But this section also is old. It appears as section 96 of the Tax Law of 1853 (Comp. Laws 1857, p. 317), and has been in existence ever since. What is new is not the law, but the criticism of the law.

The proceedings in the suit to obtain an order of sale are also criticised. The petition, it is said, states no facts. The court, if no defense is made, is required to make a decree, though it will have no judicial knowledge that a decree ought to be entered, and so on. How the Legislature, which is the only tribunal to which such criticism can properly be addressed, would undertake to answer or to obviate them we

cannot say; but we doubt if that body would be impressed with their importance. It might well be asked, why should anything more be required as a foundation for the court's proceedings than the production of the tax itself? The taxpayer is informed by that exactly what claim is made against him, and the court is informed also. Words expended in a bill of complaint would be worse than wasted: they would only furnish opportunity for technical objections, costs and delays. The issue is made when the respondent presents his objections, and the Act contemplates an issue which is as simple as possible — one which any man, however ignorant, can understand. The Legislature would be very likely to believe that public policy required an issue of that sort. We have been tending towards simpler issues in all legal proceedings in this State, from the first, with the very best results; and the Legislature many years ago made it the duty of this Court from time to time to modify and amend the practice of the several courts of record, with a view, among other things, to the abolishing of all fictions and unnecessary process and proceedings; the simplifying and abbreviating of the pleadings and proceedings; the expediting of the decisions of causes; and the abolishing of all unnecessary forms and technicalities in pleading and practice. How. Stat. § 6409. Now what the Legislature has done in this case is directly in the line of what the law requires us to do, and is therefore in harmony with the public policy of the State as evidenced by its statutes. This being so, we do not see how we can refrain from saying that it is commendable, instead of being deserving of censure. The Legislature has required all that is necessary to enable the parties to try such legal questions respecting the taxes as may be raised, and anything more would be unjustifiable, because useless and tending to cause delay and add to the expense.

Many things which are said in this connection we abstain from any mention of, or at least from discussing, because we have been unable to convince ourselves that discussion is necessary. Much of it would be just as true and just as forcible if said in respect to an ordinary suit upon a promissory

note as when said in respect to this proceeding. Let us see how that would be. A plaintiff files his declaration in assumpsit, attaching thereto what purports to be a copy of a note. Service is made on the defendant who fails to appear, and is defaulted. The plaintiff then moves for judgment, and takes it upon the default as matter of course. Execution follows afterwards as matter of course. In the whole proceeding the judge performs no function except to order judgment. Everything else is done by somebody else, and the judge, when he orders judgment, has no personal knowledge whatever, and no proof except the default, that any such demand exists as the plaintiff has counted on. The pretended note may be a forgery; it may have been obtained by fraud; it may be paid; if genuine it may be the note of some party besides the defendant. In respect to all these matters the judge is profoundly ignorant, and yet the ordinary course and practice of the court requires that he shall enter judgment. Why? Because the party defendant by neglecting to defend, admits the claim. This is the ordinary course in legal proceedings, and in strict analogy to those proceedings it has been provided in this tax law that decree for sale shall be made on default. There is nothing new or extraordinary about it.

Neither is there anything new or strange in the failure to provide for the making up of a formal record in the case. We have had no such thing as a formal record in this State since the statutes of 1846 took effect, and quite to the surprise of some persons who were educated to think that the old common-law formalities were of vital importance, we have found we get along just as well, and justice is just as effectually administered without the formal record as it before was when we had it.

We agree that lands of the United States or of the State cannot in general be taxed. When any attempt is made to do it they may well be left to make their own complaint. They are not complaining now. Neither is there any question before us whether taxing officers ought to go to the records to ascertain who are owners of the lands to be taxed.

The law in this State has never required that; and if it ever should, it would thereby make an enormous addition to the labor to be performed by taxing officers and to the cost of taxation, and without, so far as we can perceive, any advantage whatever. Records in this State are not required to show the actual title, and if relied upon would be misleading in thousands of cases.

But all this discussion of the formalities of the judicial proceeding raises no constitutional question whatever. Perhaps we could have shaped the law more wisely; but what of it? Our business is judicial, not legislative.

VII. But a sweeping objection to the act is that the Legislature of this State has no constitutional power to provide for judicial proceedings for the purpose of obtaining an adjudication upon the taxes as a preliminary to a sale, and especially that it has no power to invoke the aid of equity for that purpose.

This objection has taken us by surprise. As our laws are founded upon those of England, where a court, which like our circuit court is both a court of law and a court of equity has immemorially existed, whose peculiar office it has been to assist in the collection of the public revenue, the natural inference would seem to be that similar assistance from a court, under proper legislative authority, would be entirely and unquestionably admissible in this country. And after the repeated declarations by this Court, that the Legislature of Michigan possesses all legislative power, to the full extent that like power is possessed by the Parliament, except as State and Federal constitutions have limited it, we suppose we may consider ourselves safe in assuming that it possesses the power to authorize this proceeding unless something in State or Federal constitution forbids. It is that something, then, that should be pointed out to us.

The argument against the power is based upon the proposition that the proceeding in equity to obtain an order of sale is really a step in the course of the executive business of levying and collecting taxes and therefore in this State—however it might be elsewhere—cannot be authorized, because it would be uniting the courts in the performance of executive

duties, and our Constitution is peculiar in declaring a separation of the several departments of government.

In the proposition thus stated we think there are two errors, either of which is fatal to the argument: *First*, it is an error that the proceeding is executive; and *second*, it is an error that there is anything peculiar in the separation of departments by the Constitution of this State.

As to the first of these errors, we shall say only that if the proceeding in the assessment and levy of taxes were executive—which they are not—this proceeding in court would not be, for it has nothing to do with the assessment and levy of taxes. It takes place after the taxes are levied, after they have become a lien on the land and after the owner, if a resident, had become personally liable for their payment. The proceeding merely calls upon the court to order property sold for the satisfaction of a demand already fixed; and the power which the court is expected to exercise is exclusively judicial: it is of the same nature and has the same general purpose as the power the court exercises in rendering judgment in a common-law suit for taxes; the difference in the two cases being in the process which is issued to carry the judgment of the court into effect. In both cases the purpose is to compel the payment of taxes.

The second error will appear upon a comparison of the Constitution of this State with those of other states. The Constitution of this State provides that " the powers of government are divided into three departments, the legislative, executive and judicial. No person belonging to one department shall exercise the powers properly belonging to another except in the cases expressly provided in this Constitution." Article 3. These are very positive provisions; but instead of their being peculiar to the Constitution of this State, they are found either literally or in substance, in nearly every American constitution. Scarcely anything else is so invariably met with as this very provision. We make some quotations, selecting for the purpose states whose tax systems we shall have occasion to refer to further on.

In Illinois the provision is: " The powers of the govern-

ment of this State are divided into three distinct depart-
ments, the legislative, executive and judicial; and no
person or collection of persons, being one of these depart-
ments, shall exercise any power properly belonging to either
of the others, except as hereinafter expressly directed or
permitted." Article 3. In California it is: "The powers
of the government of the state of California shall be
divided into three separate departments, the legislative,
the executive and judicial; and no person charged with
the exercise of powers properly belonging to one of these
departments shall exercise any functions appertaining to
either of the others, except in the cases hereinafter expressly
directed or permitted." Article 3. In Tennessee it is:
"The powers of the government shall be divided into three
distinct departments, the legislative, executive and judi-
cial. No person or persons belonging to one of these depart-
ments shall exercise any of the powers properly belonging
to either of the others, except in the cases herein directed or
permitted." Article 2. The copying from other constitutions
seems unnecessary. Thirty-one of the states have like pro-
visions, and probably the rule which these provisions lay down
is universal.

We deem it safe to affirm, therefore, that the Legislature
of this State, in respect to providing for a proceeding of this
sort, has all the powers which are possessed by the legisla-
ture of any other state in the Union, and that if similar pro-
ceedings have been provided for and have been upheld by
the courts of other states, they constitute precedents which
the Legislature of this State was justifiable in following.
That such proceedings have been provided for elsewhere and
sustained is well known. In Illinois a like system to that
which this Act proposes to establish has been in force for
many years; Tennessee has had and enforced such a system;
and proceedings to which the same objection which is now
made here would be equally applicable, have existed and
been enforced in California, Pennsylvania and some other
states at some periods in the history of their legislation. In
New York it has long been the practice to have the taxes

which are assessed for city improvements reported to a court for confirmation ; and this instead of being thought an unconstitutional proceeding, has generally been deemed very proper and suitable ; and a great number of cases appear in the books of reports in which questions of the regularity and validity of taxes were raised and discussed by able counsel ; but we have no evidence that the point now raised occurred to them.

But much of the argument on this point is addressed to the fact that the proceeding which is authorized and which has been had, is in equity instead of in a court of law ; and it seems to be assumed that equity has somehow been reaching out and endeavoring to draw to itself a jurisdiction which does not belong to it. Formerly, when courts of law and of equity were held by different judges, there was danger of such encroachments, and of unseemly controversies in consequence. But in this State where the same judge is both chancellor and common-law judge, the danger that in one character he will usurp from himself authority belonging to him in the other character, ought not to be very alarming. Still, so long as the distinction between legal and equitable proceedings is maintained, we concede that the judge as chancellor must not assume to exercise in that capacity the authority that belongs to him as judge of the common-law side of his court. And we think the people of the colony of New York were quite right in protesting against the establishment of a chancery jurisdiction in their midst without legislative permission. And in this case if this proceeding were not provided for by legislation, we should agree that equity had no jurisdiction. The fallacy in the case consists in treating this as a case in which equity is endeavoring to draw to itself a new jurisdiction, when in fact it is merely exercising a jurisdiction which legislation has imposed upon it. Equity has been passive in the matter except as required by the Legislature to act.

The question, then, is not whether equity can enlarge its jurisdiction, or draw to it new powers, but whether the Legislature is precluded from enlarging the jurisdiction or

conferring new powers. If it is, what precludes it? What constitutional principle or provision stands as a barrier between law and equity to preclude the jurisdiction of one being enlarged at the expense of the other if the Legislature shall deem it wise? We know of none, and none is pointed out to us. On the contrary to set up any such barrier by judicial decision would be in plain disregard of the Constitution and of the will of the people as expressed in it. That will was and is, that the distinction between law and equity shall be abolished as far as may be practicable. When we say it shall not be, we set our will against the will of the people as expressed in the Constitution, and we cease to be guardians of the Constitution in its integrity, which courts are supposed peculiarly to be, and become impediments to its full effect.

As something is said about the incompetency of courts to exercise prerogative powers, as being a reason why they can take no part in enforcing the revenue laws, it is pertinent to remark that any argument respecting prerogative powers, drawn from English precedents and analogies, unless they be very modern ones, has very little application to anything in this country. The king had many prerogatives, and the revenue of the kingdom was supposed to be the king's revenue; but Parliament has for a long time been taking to itself his prerogatives, and has especially taken control of the general revenue. There is not a recognized principle of the British constitution to-day which would preclude any court of the realm being made an active instrument of collection of the revenue if Parliament shall will it. But in this country ever since its independence prerogative powers have belonged to the people, and the legislature as the immediate representative of the people has determined how they shall be exercised. The legislature must determine it, for there is no other competent authority. It is certain the courts cannot do it; and it is equally certain that the executive cannot. The Governor of our State has such powers as the Constitution confers upon him and no others. There are no powers which he can take by implication except they be incident to

those expressly conferred. *Field v. People* 3 Ill. 79, 80. But as we have already said, it is a fallacy to assume that duties under tax laws are executive. They are administrative duties, which under the most complete separation of executive, legislative and judicial duties by the Constitution, would require legislation to determine what officers or what agents should perform them. Some of them—as for example, the valuation of property—are quasi judicial; but the courts could not for that reason claim them as pertaining to the judiciary. Others—as for example, the collection of taxes—are quasi executive; but the Governor could not for that reason claim them for himself or his subordinates. No officer and no department could claim them except under and in accordance with legislation; and the Legislature might very properly make use both of the executive and the judiciary, or it might with equal propriety create agencies not assignable to either department. If the duties become executive or judicial, it is because the Legislature has made them so.

We have not specially referred in this opinion to the peculiarity of this proceeding as one in rem or in personam, because we have not deemed it important to do so. The proceeding is in fact what the law makes it, and needs no classification by common-law terms. Taxation of property is essentially an ex-parte proceeding, and a proceeding against the thing itself; and the notices required in the course of the proceedings are given for the most part by publication. We should agree that the officers could not carry this proceeding into court as a proceeding in rem without legislative authority, but we look in vain for any constitutional restriction upon legislative authority to permit it, or for any that would preclude the Legislature providing for the judicial proceeding the customary notice.

It is probable that when the Legislature provided for the proceeding now in question it did so because a court of equity has always been deemed the most fitting tribunal to invoke for the enforcement of liens. The Legislature when making provision for builders' liens referred their enforcement to equity as matter of course. And if it has less power to pro-

vide for the enforcement of one kind of lien in equity than for another, we do not understand why. The suit provided for is nominally in personam, but all such suits are mixed suits, and when as frequently happens personal service cannot be had, the suit proceeds as one essentially in rem.

That other states require judicial orders for sales in tax cases has been mentioned. How does it happen that the Legislature of Michigan possesses less power than the legislature of Illinois or Tennessee or any other state? What has emasculated it, and when did the process take place? But Congress also makes provision for a similar proceeding to that now under consideration. It not only makes provision for judicial proceedings to enforce the lien of the United States for taxes, but it directs them to be had in equity. Rev. St. §§ 563, 3207 et al. There can be no claim or ground for claim that Congress has greater powers in this regard than the state legislatures have. If this act is unconstitutional, so is the legislation of Congress.

This Court has held repeatedly in a series of cases beginning with *Scott v. Smart's Ex'rs* 1 Mich. 295, that it will not declare a statute void on constitutional grounds unless the conflict between the law and the Constitution is plain. If the point is in doubt, the Court will defer to the legislative judgment and sustain the statute. If the carefully prepared judgment of an able Commission, based in its essential features upon systems long in existence in other states and under the Federal government, and therefore having the approval of the legislatures of those states and of Congress, and specially approved in this State by the two houses of our own Legislature and the Governor; if this with its sanctions is not sufficient to raise very serious doubt of the correctness of an adverse view that brings and can bring no direct authority to its support, and is based in the main on theoretical reasoning,—then it would seem plain that the Legislature can never, by any care, guard against its action being set aside as unconstitutional, unless indeed the proposed work is submitted to the court in advance, and its opinion obtained upon it. But even that could be no safe reliance, for courts change in

membership, and the same members may change their opinions.

VIII. Utterly disclaiming as we do any right to pass judgment upon the wisdom or policy of this revision of our tax laws, we have not thought it improper to look at the records of the Auditor General to see what have been its practical workings. Some of the figures in that office illustrate the workings of the new law in a very striking manner. The number of descriptions of land on which the taxes remained unpaid when the time came for advertising the first year under the new law was 19,871 less than the preceding year. This will give us some idea how large is the number of persons who have been accustomed to let the taxes go unpaid on a calculation that by delay and litigation they could avoid payment altogether. The amount charged against the lands struck off to the State that year was $73,238.84, while for the preceding year it was $412,184.68; a gain to the State of $338,945.84 in the burden which that portion of its citizens who are accustomed to pay their taxes must carry. This will go very far towards overcoming the abstract and speculative objections which are made to the law. We learn in the same office that the objections made by land-owners to the practical operation of the law are mainly to the great stringency of a few of its provisions, and these might easily be altered by the Legislature so as to obviate the complaints if they should seem to that body to be grounded in reason. We have no right to assume that the Legislature will not redress any real grievance when it is pointed it. And no evil in government could well be greater than for a court to stretch its constitutional authority in order to limit, as a remedy for possible evils, the constitutional authority of another department.

The proceedings should be affirmed.

CHAMPLIN, J. concurred.

CAMPBELL, J. Defendant demurred generally to the proceeding in the circuit court for the county of Marquette to procure a decree of sale in equity for taxes levied against defendant's lands in that county. The demurrer rests on con-

stitutional grounds. It is claimed by defendant that the whole tax law of 1882 is invalid. It is further claimed that so much of it as provides for a judicial decree and sale is invalid on special grounds, whether the rest of the statute is good or bad.

The first objection, which goes against the whole statute, is that the Legislature exceeded its powers in admitting the Tax Commission to exercise legislative functions in both houses.

The statute of 1881, under which they acted, provided for five commissioners who were to be appointed by the Governor and confirmed by the senate, to prepare and report a bill for the assessment, levy and collection of taxes, to be submitted to the Legislature at a general or special session. This statute provided that the members of this Commission should be entitled to seats upon the floor of the senate and house for the purpose of explaining the provisions of such bill, and should remain in attendance until its passage or final disposition; and it was further enacted that "no amendment shall be made in either house until after the same shall have been proposed and submitted to the said Commission, for at least twenty-four hours, or until they have an opportunity to report to the house in which such amendment originated their views in relation thereto." Laws 1881, p. 146.

In pursuance of this law the Tax Commission prepared and reported a bill, and a special session of the Legislature met in 1882 to consider it. It was passed March 14, 1882, and ordered to take immediate effect. It contains no express repealing clauses, but a separate repealing law was a part of the same scheme and passed at the same time purporting to cover the previous general law and several special laws on the subject, with saving clauses as to rights under them. Although separate in form the two belong together.

During the pendency of this legislative business the Commission sat with the Legislature, debated the bill and the various matters brought up in the two houses concerning it,—in some instances induced an abandonment of action contemplated, and had all amendments referred to them and gave

their views on them before the several houses considered them.

It is not claimed that it was not competent for the Legislature to employ a commission to prepare and report a tax system, with such expression of views as they might choose to make. But it is claimed that their functions could not lawfully be enlarged so as to allow them to join in legislative discussions on the floor among the members, or to restrict the ordinary privileges of members to offer and discuss amendments to legislation without the interference of persons who were not members of either house.

It is very well settled that a legislative body cannot delegate any legislative powers, except to such corporate bodies as are authorized to regulate their own local affairs. It is similarly true that no public body or officer can admit others to a share in official discretion. And the present case certainly presents a close resemblance to cases where proceedings have been held improper by reason of the interference of unauthorized persons. The legislative power in its ultimate exercise no doubt gets expression by the vote cast for any measure. But the object of having legislative bodies meet publicly is to secure argument and deliberation among those who are to have the responsibility of voting, and who in this State must have their several votes entered of record by yeas and nays. There are several constitutional clauses bearing in the same direction. No member can be questioned elsewhere for what he says in debate. Every law is to be read three times before its passage. No new bill can be introduced after fifty days. All amendatory laws must set forth the entire section as amended. All these provisions are meant to arrest attention. There has never been any doubt about the importance of discussion in the work of legislation. And while light may be had by individuals from any source where they choose to seek it, and while every member is subject to the criticism and opposition of any of his associates, it is nevertheless well understood that the discussion on the floor should come from those who have constituencies to represent, and responsibility for all that they say. The Governor has

the right to object to a bill after it has been passed, but this must be in writing, and it would not be tolerated that he should come upon the floor during a session and dispute with members, although he shares their responsibility and is supposed to be informed.

The power of the Lieutenant Governor to debate is expressly given, and confined to the session in committee, but he also has a vote in case of a tie, and he acts under constitutional authority. But no other State officer has any right upon the floor. Even in England, where cabinet officers have seats in Parliament, it is only because they are elected as members of the lower house, or belong to the peerage. They cannot speak except as members. It may very well be that there are many persons who on special subjects could enlighten a legislative body; but if the public law puts this function upon the members themselves, it contemplates that the preparation for voting on which the result of a vote must always depend, shall be confined to the members. Each legislative house is supposed to be, above all other things, a deliberative body acting on the conclusion of its own deliberations. If it is competent to admit one set of men, it is just as competent to admit others; and if it is lawful to tie the hands of members and of the houses until this Commission had deliberated, it might just as well be done in any other case and with any other person or body.

The rule which has held action invalid when shared by unauthorized persons, is not confined to their votes. An intruder in the room of either a grand or petit jury need not vote, in order to invalidate their acts. If a disqualified person sits in a board of magistrates or commissioners, it is presumed that his views may have affected the result. *Reg. v. Justices of Suffolk* 14 Eng. L. & Eq. 90; *Reg. v. Justices of Hertfordshire* 6 Q. B. 753. And it is easily to be seen that the presence and influence of men of recognized eminence might operate with some effect to prevent modest men from expressing their views in opposition to their arguments or opinions.

In this instance the commissioners had every power given to any member except that of voting. They had the power

which no member possessed, of speaking in both houses.
And they had the further power, beyond that vested anywhere
else, of stopping action on any amendment until they had
first had a chance to consider it. It is difficult to see why
their functions did not embrace the most important part of
legislative business, which is preparing the minds of the
house by persuasion and argument to vote upon such meas-
ures as they favored. And as the journals show very con-
clusively that the legislation in question was actually influenced
by their intervention, the question is very distinctly presented
whether this was lawful.

It seems impossible to avoid the conclusion that so much
of this statute as brings in substantial innovations upon the
old system which it was meant to displace is directly to be
traced to this influence. But in the case now before us the
most important question raised relates to the proceedings
after return to the Auditor General's office, and the two parts
of the statute do not rest on the same grounds. Up to the
return to him the action is confessedly of an administrative
character, and if otherwise regular might be ratified, if now
deficient, by future legislation. It is, although different in
some respects, substantially in harmony with the former
tax laws and introduces no new principle. But the pro-
ceedings to bring lands to a sale, after they have been
returned to the Auditor General, are so vitally changed as to
form an entirely new scheme. If this law is enforced accord-
ing to the theory of its framers, the work of the administra-
tive department ceased when the time for payment without
charges ran out, and the judicial department intervened to
complete it. As to the former the difficulties need not inter-
fere with saving the taxes. If the judicial proceedings are
invalid the Legislature, having no judicial power, cannot mend
them.

We may therefore confine our attention to the validity of
the proceedings more immediately involved. If the defect
already alluded to were the only one alleged, provision might
be made for selling these lands by future proceedings of a
similar character. But it is claimed that the so-called judicial

scheme provided for is subject to objections which no legis-
lative action could overcome, and is in itself a violation
of constitutional requirements and guards. As it is very
peculiar, and in some respects, so far as we are informed, en-
tirely original, it is important to understand its precise course,
which may be briefly stated.

After the taxes have been returned uncollected to the
Auditor General, and have remained in his office until the
first day of July in the subsequent year, he is required to
prepare a book for each county, in which each parcel of land
is set out, and opposite each parcel is to be set an aggregate
sum which is made up by adding together all of the taxes
returned against it with interest up to the first Monday in
the succeeding May, and sixty cents additional on each parcel
for expenses. The same book which is intended to have the
entire record in itself is to have other parallel columns for
inserting various memoranda as to future payments, sales,
redemptions and court orders. In this book which, when
prepared, contains these two entries of description and of the
aggregate sum demanded, the Auditor General is to insert a
brief petition addressed to the circuit court of the county, in
chancery, containing no averments, but merely referring to
this schedule of lands and amounts, and praying "a decree
in favor of the State of Michigan against said land for the
payment of the several amounts so specified therein, and in
default thereof that such lands be sold." This petition is
to be signed but not verified. The statute goes on to say
that it "shall be deemed equivalent to a bill in chancery to
enforce the lien for such taxes, interest and charges, averring
their validity, that they have not been paid, and praying for
a sale to pay such lien." This is to be filed in the county
clerk's office as soon as practicable after the first of July.

The Auditor General is required to publish a copy of this
petition and schedule once a week for three weeks before the
time which he, and not the court, fixed for hearing, and with
it a notice that the petition has been filed claiming a decree
against each parcel for the sum therein specified, and that it
will be brought to a hearing at the next term of the court

at a time and place specified, and " that all persons interested
in such lands and desiring to contest the lien claimed thereon
for such taxes, or any part thereof, shall appear in said court
and file with the clerk thereof their objection thereto on or
before said day, and that in default thereof a decree will be
taken as prayed for in such petition." In the same notice he
is to state that on the first Monday of May next thereafter,
the lands described in the petition and ordered sold will be
sold at some convenient place in the county named.

The statute provides that the publication of this notice
"shall be equivalent to personal service of notice on all per-
sons interested in the lands specified in such petition, of the
filing thereof, of all proceedings thereon and of the sale
of the lands under the decree, and shall give the court juris-
diction to hear such petition, determine all questions arising
thereon, and to decree a sale of such lands for the payment
of all taxes, interest and charges thereon. The circuit court
in chancery shall have jurisdiction to hear, try and deter-
mine the matters alleged in such petition, even though the
amount involved therein be less than one hundred dollars."

This publication is to be made in such county paper as the
Auditor selects, or in any other county if there is no county
paper, or paper in an adjoining county properly qualified, or
if it will not do the work.

No particular time is fixed for beginning this publication,
and no particular term is required, except so far as may be
inferred from the requirement that the decree of sale shall
be as much as ten days before the appointed day of sale, on
the first Monday of May. In most counties more than one
term would occur in this interval. If no decree is made,
then the Auditor is to re-advertise in the same way as soon
as he can. In the present case the papers were not filed till
January.

Parties desiring to contest must file specific objections
before the day fixed, and are confined to them; but may on
showing within five days that they have been prevented
without their fault, be allowed within the next five days to
file such objections. The court is required to proceed sum-

marily, giving precedence to the tax matters over all other business. "The taxes specified in the petition shall be presumed legal and a decree be made therefor unless the contrary is proved." All evidence is required to be taken in open court, and oral evidence may be taken down and filed if desired. The court is to determine the admissibility of all evidence, and the decision so made is final, and not subject to review or appeal.

All orders relating to any land are to be made by a "brief entry" in a column of the book before referred to, opposite the parcel, signed by the judge by his name or initials, and this is to have the same effect as if made and entered as part of the final decree. The total amount of taxes, interest and charges allowed by the court is to be entered in that book by the register opposite the land in a parallel column.

The final decree is that the amounts set down in that column in the book are valid, and a decree is granted for such amounts, and for a sale of so much as shall be necessary to satisfy the same, and that all orders entered in said book are made a part of the decree with the same effect as if entered therein. This decree is the only thing entered in the chancery record of the court, and requires the aid of the tax-book to show any of the matters desired.

As soon as made, a copy of this decree is to be annexed to the book, and then such tax record is to be delivered to the county treasurer, and required by the statute to remain in his office except as it may be needed in the clerk's office.

No one can appeal against any decree allowing a tax, unless within ten days after the date of the decree he pays the amount to the county treasurer, and within twenty days from such date of entry files a proper bond for costs. Either the county treasurer or Auditor General may direct an appeal on behalf of the State. "Such decree shall be considered as a several decree in favor of the State of Michigan against each parcel of land for each tax included therein."

On the first Monday in May the county treasurer is to begin the sales and continue them till completed. The sale

is to be at some convenient place at the county seat to be selected by the county treasurer. Section 63. This provision is not quite in harmony with a previous one in section 55, requiring the Auditor's notice to specify the " convenient place in the county " where the sale will be made. And the law is also inconsistent in providing by section 78, that unless satisfied with the county treasurer's bond, the Auditor General may appoint any one else to make the sale. The law contains no provision for reports to the court by any one but the county treasurer, or for giving credit to the acts or statements of such appointee of the Auditor, who has no power to appoint men to public office, and whose employees are not made public officers.

Within twenty days after the first Monday in May the county treasurer is to file with the clerk a report of the sale, referring to the tax record for the particulars. The sales are entered in this same record opposite the various parcels of land. All sales stand confirmed unless objections are filed within eight days, with no further ceremony. When confirmed the sales are reported to the Auditor General, and he is to make deeds. The law declares that "such deeds shall convey an absolute title to the land sold, and be conclusive evidence of title in fee to the grantee," subject only to subsequent taxes. The court is authorized to put purchasers in possession by writs of assistance.

These are the provisions generally applicable. There are some special provisions which do not affect any principle involved in this inquiry.

Such being the statutory provisions which are intended, as the State claims, to create the effect of decrees and sales in equity, some reference to the differences which appear at once on examining this scheme will be necessary to aid in determining how far such action is entitled to respect as involving the exercise of lawful judicial powers.

No tax can be levied and none is sought to be levied, on any lands that do not belong to private owners. Lands of the United States, or of the State, or of its municipalities are not taxable. The land is taxable and is taxed solely

because it is private property. And this condition existing, the taxing officers always have the means of knowing where the record shows the title to remain as assessed. There is no jurisdiction to tax land merely because it is in the State. It must be private property. And every tax is made a debt against the person assessed.

This statute does not seek to charge several individuals as interested in one common fund, or subject to a joint or collective burden. Each parcel of land is kept distinct from all the rest, and as to each the proceeding is a several proceeding. Against each lot is charged an aggregate sum which includes all the unpaid taxes ordinary and special, local and general, that have been returned against it. The taxes were all laid and apportioned in the early stages of the work while in the hands of town officers. If objections exist they may or may not be confined to a single lot, or to single taxes; or to single townships or wards. The case stands as to each precisely as it would if no other lands had been returned charged. The percentage in two towns can seldom be the same, and there may be differences in the taxes themselves.

But there is nothing on the face of the petition and record from which the court called on to act can derive any information. All that the court knows is that as to each parcel the Auditor General asserts a certain aggregate of taxes stands returned. The record does not aver or show of what items these taxes consist, or for what purposes they were levied, or on what valuation they rest, or whether they include all or only a part of the whole taxes assessed. While, in order to make any tax valid a series of consecutive acts must have been performed according to law, the petition avers none of these, and refers to no documents or facts to sustain them. And the statute, except in cases where parties see fit to come in and raise objections, neither requires nor permits the court to inform itself concerning these matters. And when parties do appear, it makes every assumption against them, and lays down the rule, contrary to every doctrine of jurisprudence, that it is not for a plaintiff to aver the facts necessary for his right, or to prove them; but that the defendant must in all

cases show a defense and be presumed to be in the wrong until he does so. The law makes no exceptions in favor of persons under disability from age, absence or any other cause.

All the intelligent functions which, in the case of parties not appearing, are performed by any one, are performed by persons distinct from the court. The judge has no judicial action whatever to perform. The Auditor General, who represents one of the parties, selects his own time out of several possible terms for filing the tax-book and chooses his own paper to give notice in, and designates the time of hearing. When that time comes all private business must give way, and all suitors stand aside until the tax cases are heard. If no objection is filed as to any parcel the court cannot examine whether it should be bound, but must decree against it at all events. If on the other hand a defense is put in, then the defendant has no protection against such rulings upon testimony as may cut off altogether such defense as he rightly possesses.

Although every court of equity is a court of record, and its proceedings must, according to the essential constitutional meaning of the term, appear in its own files and entries, there is in no case under this law on the court records anything to show what the court had jurisdiction to do, or what it has done. The whole court action appears in the book entries, and nowhere else, and this book belongs in the custody of the county treasurer. It is this officer and not an officer of the court, or one who is subject to its direction, who makes the sale under conditions not imposed by the court, and who is in no way responsible to the court for his doings on the sale or his dealings with the funds. And when he reports the sales, which he does merely by reference to his own entries in the record-book, he gives no facts or information whereby the court can know whether or not he has acted legally, and unless exceptions are filed, the confirmation is of course. In other words the conclusive effect of a decree and of a regular sale confirmed under it, is given to an ex-parte proceeding in which the court has never been consulted, has never had the power or right even to form an opinion, has

issued no process, has exercised no judgment and has pos-
sessed no control. Moreover it has had none of the powers
which are inherent in every tribunal acting judicially of
preventing the parties from being deprived of rights by acci-
dent, ignorance or misconduct of others.

If such transactions have anything in common with the
essentials of judicial action it is very difficult to find it. If
the law were to allow a private person to join all his causes
of action against several hundred persons in one proceeding,
bring them all in by one published notice in any paper he
may select, and compel them all to have summary judgment
against them unless they should prove their innocence, the
result would be analogous to this, except that this has further
defects.

But the constitutional questions perhaps require more defi-
nite reference. So far as the argument went, there was no
precisely analogous practice to the present brought to notice.
But, after all, the matter must be determined by our own
Constitution as read in the light of our own system, into
which it was made to fit. The question is not whether the
State may not use summary and strong means to collect its
taxes. It has ample power to do this by proper executive
methods. It is whether, when it undertakes to call in the aid
of judicial proceedings, it can call that judicial which is not
judicial, or bind persons or property without any regard to
the rules of jurisprudence.

The constitutional rule which gives a right to due process
of law covers property as well as personal rights and obliga-
tions. It has always been invoked as protecting men from
being robbed of their freeholds. And undoubtedly, as has
been decided frequently, it does not require that the courts
shall intervene in any of the stages of taxation. On the con-
trary it is well settled in this State as well as elsewhere that
taxation and its methods are prerogative and not judicial,
and that courts cannot assume or exercise the functions of
taxing officers. They cannot use their own discretion to cor-
rect the discretion of executive officers, and they cannot on
the other hand be deprived, in the exercise of judicial power,

of the right to form their own judgments. Nothing can be
a judicial act in which the judge has nothing to decide. And
it must not be forgotten that whatever ·judicial power exists
at all, is by the express terms of the Constitution of Mich-
igan vested in the courts and cannot be taken away from
them, while that which is not judicial they are as expressly
debarred from exercising, and it must be vested elsewhere.
Our Constitution is peculiar in prohibiting one department
from using the powers of another. It is not in the power of
the Legislature to make that judicial which is not so by
nature. See *Aud. Gen. v. Pullman Palace Car Co* 34 Mich.
59 ; *Ambler v. Aud. Gen.* 38 Mich. 746 ; *Perrine v. Town-
ship Board of Hamlin* 48 Mich. 641 ; *Whitbeck v. Common
Council of Hudson* 50 Mich. 86 ; *Supervisors of Midland
v. Aud. Gen.* 27 Mich. 165 ; *Ayres v. State Auditors* 42
Mich. 427.

It is solely on this principle that proceedings to levy and
collect taxes have been generally if not uniformly held valid
without that same kind of process of law which is requisite
in judicial proceedings. The collection of public revenue
is necessarily by non-judicial action, and if that action is regu-
lar and not in disregard of legal requirements it is binding
on every one. But inasmuch as there is no judicial action
in its proper sense, it has always been held that it was not
competent for the Legislature to make such action as against
taxed property conclusively regular and sufficient, although
prima facie presumptions may be permitted. It would be
absurd to require due process of law as a constitutional right,
if the Legislature could make irregular process valid by
declaring it entitled to conclusive presumptions of validity.
Constitutions would be useless if such a course could be main-
tained. There is no question but that whatever absolute
rights exist have a claim to judicial protection in some form,
and when a man's freehold is sought to be charged or wrested
from him, he must have a right to test the legal sufficiency
of the proceeding under which it is attempted. A judgment
lawfully rendered ends the controversy, but nothing else can.
And it is undoubtedly in view of this principle of the force

of judgments that the present statute was passed, which aims to make a judicial proceeding of what was never in this State regarded as such before, while at the same time it discards the essential conditions of jurisdiction.

From the time of the Territory down to the passage of the present Constitution the laws have always provided that after taxes have been returned to the Auditor's office he should in due time advertise them for sale by the county treasurer or some substitute. The law has always empowered him at any time before sale, and sometimes thereafter, of his own motion, or on complaint of land-owners, to set aside illegal taxes on any ground which could be recognized by a court as ground of illegality. This inquiry, involving chiefly an investigation of matters of record, has been uniformly treated as non-judicial, for otherwise it could not have been carried on except by a court, in which all judicial power is required by the Constitution to be vested. On setting them aside he could do what the law allowed to charge them back, or otherwise protect the public interests. And no court has ever interfered to review such action, as it might do by certiorari if judicial. On the contrary when sales have been threatened for illegal taxes, they have been restrained by injunction as wrongful attempts by an executive officer under color of office, and not as the acts of an inferior judicial body, to be reviewed by appellate action.

The power vested in the courts of equity under this statute must necessarily be tested by its effect, where no one appears. If the court has no jurisdiction non-appearance waives nothing. If the court has jurisdiction, non-appearance cannot prevent a binding judgment, and the court can render it. As already pointed out the court here, in case of non-appearance, has nothing to do which might not just as well be done by its clerk, or by any one else. The statute is peremptory. The court has no means of knowing whether any or, if so, what taxes were ever levied or returned, or whether valid or invalid. It seems a little absurd to speak of this as judicial. There can be no judicial proceeding in any other case without such an averment of facts as will enable the court from

the facts to draw a legal conclusion. But here nothing is averred that leads definitely to any conclusion. It has always been competent, at law and in equity, to take the judgment of an appellate court upon the sufficiency of the record to maintain a judgment, and it is always a sufficient objection that facts are not averred. The return of lands may be valid and may be invalid, and this return is the only fact apparent. And it is equally necessary to the existence of a general court of record that it may control the course of its own business, oversee or regulate the execution of its own process, relieve parties against defaults, grant new hearings and secure justice. A court that has no discretion whatever of this sort would be an anomaly.

There is another peculiarity which distinguishes these from judicial proceedings. They cannot be continued from term to term until they are all finished. The statute provides that if for any reason no decree is rendered, or none as to any part of the taxes, a new petition must be filed and the whole process gone over again. See section 60. A judicial proceeding which is to be regarded as a suit in equity, cannot drop in this way. When a court of equity gets jurisdiction it keeps it.

The statute really makes this proceeding a mere intervening step in the course of the executive business of levying and collecting taxes in which the Auditor General is the only person invested with discretion, and in which he determines how and when the matter shall get into court, and gives notice of the sale before the court has been called on to act. The record is kept in an executive office; the time and terms of sale are fixed by statute, and with the single exception of the case where objections are filed there is no investigation. And in the case of infants who are under the peculiar protection of the court, and of absentees who are never decreed against without proofs, there are no means provided for discrimination. All are under the same rule and bound, if at all, by the same constructive service.

If the powers exercised by the circuit courts under this statute differ from those formerly exercised by the Auditor

General, it is not because the inquiries are different in kind, but only because they are narrower and not wider than his. He could always determine all that the court determines, and whatever further force is given to the conclusion here, is given by the statute itself.

It was further claimed, however, that even if this procedure which has always heretofore been treated as prerogative, can now be regarded as judicial, it is still void—*first*, because undertaking to bring into equity what is not equitable; and *second*, because it undertakes to reach parties without lawful process.

In all tax proceedings there is room for controversies which belong to courts of law. Whatever presumptions can be allowed in favor of the sufficiency of proceedings not judicial, they cannot be conclusive. There are constitutional and other conditions concerning taxation which the courts are bound to enforce. If a tax deed was issued under any of our previous laws, its validity was always open to attack before a jury. And it has been held repeatedly that equity cannot of its own motion or by statute step in and litigate tax titles where the questions can be tried at law, as they always can be if the claimant against the tax title is actually or constructively in possession. *Blackwood v. Van Vleet* 11 Mich. 256; *Tabor v. Cook* 15 Mich. 322; *Torrent v. Muskegon Booming Co.* 22 Mich 21.

And it has also been held, on the same principle, that although partition is one of the ancient and ordinary subjects of jurisdiction in equity, yet a disputed title must nevertheless be tried at law. *Hemingway v. Griswold* 22 Mich. 21; *Phelps v. Green* 3 Johns. Ch. 302.

It is undoubtedly true that this statute undertakes to avoid this difficulty by having the validity of the tax determined before the sale and not after. If this power exists there could never have been any reason why, without a statute, a separate chancery proceeding against single parcels of land, in the ordinary form of a bill could not have been filed. There can be no power in any legislature to change the nature of equity, and draw to it a jurisdiction not warranted by legal

principles. But no one ever imagined that a court of equity had any more power than any other court to intervene to aid taxation. Having always provided that a sale for taxes should not be a judicial sale, and needed no decree of a court to authorize it, it cannot very well be now claimed that equity has any greater power than it had before, to take part in pro-ceedings that neither begin nor end in a court, and that are never from beginning to end under the control of a court.

Constitutional rights are not subject to any such juggling process. If they can be evaded as readily as this process would enable them to be evaded, it is impossible to say what rights would be left at all. Courts are bound to look at sub-stantial rights and see that they are maintained.

The jurisdiction of equity, while very valuable in its place, is one which has always been regarded as not open to enlarge-ment for new cases not covered by old principles. Under the British constitution the king was reckoned as the fountain of justice, and had unlimited power to create new courts. But it was held to be contrary to the Great Charter to create a new court of equity, or to provide that an existing court should exercise a new equitable jurisdiction. Com. Dig. "Chancery," A 3; "Prerogative," D 28, and cases cited. The authorities referred to declare his inability to authorize any court existing or newly created to entertain any new juris-diction which does not preserve the common-law right of trial by jury. And even in the summary exchequer processes, which although conducted by a court were prerogative in their nature, there was always at some stage a right to a trav-erse and jury.

In New York the power, without legislative consent to create a chancery jurisdiction in the colony, was vigorously resisted. 1 Hoff. Ch. Pr. 13, 14. And the action of the early Congresses, which has in this country always been regarded as a proper exponent of the rights afterwards se-cured by constitutional provisions, condemned as entirely illegal and contrary to the Great Charter all of those expedi-ents resorted to by Great Britain to deprive parties in revenue as well as in other cases, of resort to juries. When we find

in a constitution the retention and assurance of this right, it. cannot be claimed that it is to be made subordinate in any way to any legislative power to destroy it under color of new remedies.

The only ground on which this jurisdiction can be plausibly based is that equity has power to entertain proceedings in rem, and that as to such proceedings no process is required beyond some general notice, which need not be brought home to any one.

For this there is not a shadow of authority that could avail here. The proceedings in a court of equity have always been in personam, and it is only in very modern times that decrees. could be enforced except by attachment. In this respect there has never been any distinction between law and equity. The whole theory of both has been that the property of any defendant could only be reached and bound after he had been properly warned to appear. And there has never been any exception to the rule that no one could be lawfully summoned into court without personal warning, unless it was impossible to find him where he could be summoned. So far as liens are concerned, instead of it being the rule that equity can enforce them, the rule is nearly universal that it cannot. The liens which equity enforces are almost without exception those which it has been enabled to bring within its jurisdiction by some theory of equitable interests analogous to the various mortgage rights, or coming within the category of equitable interests. It is undoubtedly true that it has expanded its list of equities in that direction, and that mortgages and quasi mortgages are numerous. But no one ever contended that a statutory lien or charge not springing from contract relations could be treated as an equity, or that equity could deal with it on equitable conditions. It is a purely legal right, and equity must always so regard it.

It needs but a little consideration to see that if the existence of a lien can enable equity to draw the controversy into its own charge and dispense with process it would not be difficult to wipe out most legal rights. It is common in some of our states to allow lands and other property to be attached

in advance and held liable for such judgment as should be thereafter rendered. There are many classes of laborers and others who have liens on property in their hands for various purposes. There are multitudes of liens on maritime property. But it has not been imagined that these liens in any way affected the nature of the controversy as legal or maritime, or that the fact that property was held for ultimate satisfaction gave equity any control over it.

Still less has it ever been held that a party who would otherwise be entitled to personal notice could be deprived of that right by seizing his property, or by placing liens upon it. The analogies of admiralty have never been extended. That jurisdiction was recognized as already existing when this country was settled, and at the early period when it was fixed it was not within the power of any court of common law to deal with maritime or foreign interests at all. The jurisdiction once fixed, whether wisely or unwisely, was no violation of the common law, and so far as any change has taken place, it has been by enlarging the office of the common law so as to cover all personal actions, sometimes concurrently and sometimes exclusively. And while the present course of decision has attributed to the admiralty jurisdiction over waters not formerly supposed to be under it, yet these decisions have all gone upon the ground that the Constitution itself so extended it. The idea that Congress or the courts could enable it to trench on the common law has always been repudiated. It is the common law that is favored, so that equitable rights may be enforced by it where practicable, as it often is.

The necessity of personal service where attainable, has been recognized in all of our courts by decisions which would be entirely wrong if other notice would be available. The statutes authorizing publication against absentees have been treated universally as in derogation of common right, and as requiring strict construction, although no personal decree can be made under them, and nothing is bound but the property in litigation. They are treated as substitutes for the old and tedious processes of sequestration and out-

lawry, and as harsh and only justified by necessity. Nothing short of a full compliance with the statutory conditions saves such decrees from being held absolutely null and void. A failure is not treated as merely irregular. *Platt v. Stewart* 10 Mich. 260; *King v. Harrington* 14 Mich. 533; *Soule v. Hough* 45 Mich. 418.

It has also been a settled rule, which would be senseless if complainant's theory is correct, that no decree can be taken on the merits on the mere default of a person not served personally. Our own statutes have introduced no new rule in requiring full proof in all such cases. *Brown v. Thompson* 29 Mich. 75; *Williams v. Corwin* Hopk. Ch. 471. And where there are no facts distinctly alleged, but merely inferentially, it is questionable how far a pro confesso would in any case authorize a decree. The general rule is that nothing is admitted that is not well pleaded. Id. So it has been held in this court that an infant is not bound by a decree which is rendered without proof. *Chandler v. McKinney* 6 Mich. 219; *Smith v. Smith* 13 Mich. 262; *Ballentine v. Clark* 38 Mich. 396.

It is further to be noticed, as previously suggested, that under this statute the decision of the circuit court on testimony is final and cannot be reviewed on any process. By the Constitution the Supreme Court is given supervisory power over all other courts. This must be exercised in accordance with the nature of their jurisdiction, but it cannot be taken away. The only and immemorial method of reviewing cases in equity is by appeal from the final decree. Appellate power beyond this is not uniform. But the chief criterion to determine what action of the court of chancery is equitable, and what part special or prerogative, has always been whether an appeal lay to the House of Lords. *In re Lanesborough* Lloyd & Goold 503; *Ex parte Shaw* Beat. 33; *Kennedy v. Earl Cassilis* 2 Swanst. 326; *Ex parte Bryant* 1 Ves. & B. 211; *Oxenden v. Lord Compton* 2 Ves. Jr. 72; *Rochfort v. Earl Ely* 1 Brown Parl. Cas. 450; *Sheldon v. Aland* 3 P. Wms. 108, note; *Saul v. Wilson* 2 Vern. 118; *Ex parte Phillips* 19 Ves. 122; 3 Dan. Ch. Pr., ch. 28, § 3, p. 1633 et seq; *Teynham v. Lennard* 1 Brown Parl. Cas. 544;

2 Story's Eq. Jur. § 1335; 2 Fonb. Eq. 225, and notes. This subject was referred to somewhat in *Cady v. Knit Goods Mfg. Co.* 48 Mich. 133.

The essential importance of an appeal in equity is that there may be a full rehearing in an appellate court, and that nothing shall be done in the court below which shall affect the merits without appellate redress. Even at law a bill of exceptions will bring up all rulings upon testimony. The exclusion of testimony may be very easily the destruction of a case or defense.

The statute has left no doubt as to the nature of the proceedings as it is intended to have them operate. Each parcel of land is not only to be charged with a tax, but the decree is to be the foundation of a conclusive title. The petition is declared to be, while it practically avers nothing, " equivalent to a bill in chancery to enforce the lien." The decree is to " be considered as a several decree in favor of the State of Michigan against each parcel."

The case cannot be changed in character by the fact that a hundred or possibly a thousand suits are consolidated. They are all in fact and are all meant to be distinct controversies with each land-owner. If only one tax remained unpaid the proceeding would be the same. The vital mistake is in attempting to turn into an equitable proceeding that which is not in its nature a judicial or equitable matter, and then to avoid compliance with the rules of universal jurisprudence, because by reason of this very error it is found difficult to do what law and justice require as a condition of jurisdiction.

If there were occasion to consider the notice itself, there would be some difficulty in treating it as adequate. In the long interval between July first and the succeeding May there is usually more than one term, and no one could be informed without continued vigilance when his objections could be filed. But this sort of notice cannot serve as ordinary process in equity.

The demurrer should be sustained and the proceeding dismissed.

SHERWOOD, J. concurred.